Robert APPLEBAUGH, a/k/a Robert E. Applebaugh, Plaintiff–Appellee and Cross–Appellant,

v.

BOARD OF COUNTY COMMISSIONERS OF SAN MIGUEL COUNTY, STATE OF COLORADO, Defendant–Appellant and Cross–Appellee.

No. 91CA1000.

Colorado Court of Appeals, Div. IV.

July 30, 1992.

Overholser & Slee, P.C., John W. Overholser, Montrose, for plaintiff-appellee and cross-appellant.

Younge & Hockensmith, P.C., Earl G. Rhodes, Mark R. Luff, Grand Junction, Thomas V. Holland, County Atty., Telluride, for defendant-appellant and cross-appellee.

Opinion by Chief Judge STERNBERG.

In this C.R.C.P. 106(a)(4) action, the Board of County Commissioners of San Miguel County (Board) appeals a judgment reversing its rezoning of the property of Robert Applebaugh (developer). The developer cross-appeals the trial court's determination that he received a fair hearing and contends that the court erred in not ruling on his claim that the rezoning constituted a taking, giving rise to a monetary claim. We agree with the court's determination that the developer received a fair hearing, but we reverse the judgment and remand with instructions to reinstate the Board's zoning decision. We further hold that the developer has no monetary claim resulting from the rezoning.

In 1979, the Board approved the developer's application to subdivide a 201–acre parcel known as the Placer Valley Village Subdivision. The subdivision contained approximately 107 acres zoned for residential use and three undeveloped areas, including a 57–acre parcel known as "Outlot B," zoned Agriculture/Forestry.

Subsequently, the developer sought a change in the county's master plan to permit tourist-oriented commercial development on part of "Outlot B." After a public hearing, the planning commission denied the request, upholding the master plan's requirement that commercial activities must be oriented towards the local population. However, two months later, the planning commission recommended that the Board approve the developer's application to rezone approximately 60 acres of the

Placer Valley Village Subdivision to Planned Unit Development (PUD).

The rezoning resolution described the PUD as containing four single-family residential lots, "Outlot A," dedicated to the county and zoned residential, and "Outlot B," which was to include "20,000 total square footage … the upper story to house 10 long-term rental apartment units under one ownership, the lower story commercial space as designated by the Planning Commission."

The Board approved the resolution contingent upon:

a change of language on the plat referring to future development to be approved by the Board of Commissioners (for outlot B); and if new commercial uses are desired, a new request must be submitted to the County; and the commercial uses shall be those shown in the submittal by Robert Applebaugh on October 12, 1982 (Laundromat; beauty shop; convenience store; restaurant; liquor store; offices: attorney, doctor, real estate).

The following notation was placed on the plat:

Future Development includes future development only will require addition p & z request not approved for development with this plat.

The planning commission then gave final PUD approval and final subdivision approval to the four residential lots and "Outlot A" but not to "Outlot B." Nevertheless, the chairman of the Board signed a replat titled "Replat of Out Lot A and Portion of Outlot B Placer Valley Village Subdivision Amended."

In August 1984, in accordance with the county's PUD zoning regulations, the developer submitted a request for final PUD approval of the commercial portion of "Outlot B." Because the planning commission found his application was incomplete, it tabled his request and granted him a one-time, one-year extension to provide additional materials, including the proposed sewage treatment system and appropriate state agency approvals. It also advised him that, under the county's zoning regula-

tions, failure to meet the December 1985 deadline would result in action causing the commercial PUD zoning to revert to its original Agriculture/Forestry designation.

The developer took no further action, and in March 1986, he was informed that the preliminary PUD zoning had lapsed with respect to the proposed commercial property. He did not respond to this notice, nor did he take steps to develop the property.

Four years later, in response to a citizen's request formally to revoke the PUD zoning, the Board determined that *Spiker v. Lakewood*, 198 Colo. 528, 603 P.2d 130 (1979) precluded automatic reversion when a developer failed to comply with zoning regulations, and thus, it concluded the automatic reversion provision in its zoning resolution was inoperative.

Consequently, it initiated rezoning proceedings on the property to clarify its zoning status. After receiving a positive recommendation from the planning commission and conducting a public hearing at which the developer presented evidence, the Board reinstated the prior zoning of Agriculture/Forestry and Open Zone to the commercial portion of "Outlot B." It based its decision upon the developer's failure to apply for final development plan approval and upon its finding that commercial zoning for "Outlot B" was inconsistent with the county's comprehensive development plan.

The developer filed a C.R.C.P. 106(a)(4) action, and the district court reversed the Board's action. It held that, by signing the replat of "Outlot B," the Board had approved the language regarding future development and that, its contingency having been satisfied, the zoning was final and binding upon the land and the parties.

The court then concluded that the Board abused its discretion in rezoning the property by failing to make findings that the character of the neighborhood had changed or that a public benefit would be achieved.

The court also rejected the developer's claim that he had not received a fair hearing, and it concluded that it need not address his argument that the rezoning constituted a taking.

## I.

The Board contends that, although the developer satisfied its condition for approval of the preliminary development plan, his failure to get final development plan approval from the planning commission triggered the county zoning resolution's provision that the zoning on "Outlot B" reverted to Agriculture/Forestry. It further argues that although *Spiker v. Lakewood, supra,* proscribes automatic reversion and mandates a hearing prior to returning the property to its original zoning status, it does not address the standards applicable to a reversionary rezoning. It claims that proof of the developer's failure to comply with the county's zoning requirements for PUD zoning is sufficient to justify reversionary rezoning so long as the prior zoning is consistent with the county's comprehensive development plan.

## A.

We agree with the Board's contention that PUD zoning on the commercial portion of "Outlot B" was never finally approved.

■ County commissioners are authorized to adopt zoning regulations to guide the use and development of land within the unincorporated territory of the county. *Beaver Meadows v. Board of County Commissioners*, 709 P.2d 928 (Colo.1985).

■ Planned unit development applications must meet all the standards, procedures, and conditions of the zoning regulations. *Ford Leasing Development Co. v. Board of County Commissioners*, 186 Colo. 418, 528 P.2d 237 (1974). Also, because PUD zoning allows greater flexibility than traditional zoning, greater emphasis is given to site planning in PUDs than in single use districts. 2 R. Anderson, *American Law of Zoning* § 11.16 (3rd ed. 1986).

To acquire PUD zoning under San Miguel County's zoning resolution, an applicant must proceed through several steps. Initially, he must submit a sketch plan for approval by the planning commission, followed by a preliminary development plan,

which must be recommended by the planning commission and approved by the Board.

Within 24 months after approval of the preliminary development plan, an applicant must submit a final development plan to the planning commission. This plan must provide details concerning roadways and parking, utility services, development schedules, and any other special problems of the proposed PUD. It is the means by which the planning commission assures that the PUD development is in accord with what the Board preliminarily approved.

Only after approval of the final plan may building permits be issued. Furthermore, the zoning resolution provides that if an applicant does not apply for final development plan approval for any reason, the preliminary development plan approval is revoked and the area reverts to its original zoning.

At the preliminary-development stage of the PUD zoning process, the Board conditioned its approval upon the addition of language to the subdivision plat amendment to clarify that the commercial development was intended to serve the local population. The district court held that, because the language on the plat concerning future development satisfied the Board's condition, the commercial zoning on part of "Outlot B" became final.

Although the plat notation was somewhat confusing, we agree that it satisfied the Board's concern that commercial uses not oriented toward the local population would be subject to its review. However, meeting the Board's condition for preliminary plan approval did not relieve the developer from complying with the other steps required by the zoning resolution.

We do not agree with the district court's conclusion that the Board chairman's signature on the replat resulted in final approval for the commercial portion of the developer's PUD zoning. Such a conclusion would essentially authorize the Board to amend its zoning regulations without conforming to the statutory requirements of a public hearing and vote by the Board. *See* § 30–28–116, C.R.S. (1986 Repl.Vol. 12A).

The planning commission determined that the information submitted by the developer at the final-development stage of PUD zoning was insufficient, and it granted him a one-year extension to provide additional material concerning proposed sewage treatment and appropriate state agency approvals. Providing such information was a separate requirement from that upon which the Board conditioned approval of the preliminary development plan.

Although the developer complied with the first steps required by the zoning resolution, he did not submit a final development plan. Approval of PUD zoning was conditioned upon his compliance with all the procedures and standards of the zoning regulations. *Ford Leasing Development Co. v. Board of County Commissioners*, *supra*. Accordingly, the commercial portion of the PUD zoning of "Outlot B" was never finally approved.

### B.

In regard to the reversionary rezoning proceedings of the Board, the trial court held, and the developer argues, that the Board was required to find a sufficient change in the character of the neighborhood or some other compelling interest mandating a change in zoning. We are not persuaded.

In *Spiker v. Lakewood, supra*, the court held that a provision for automatic reversion of property amounted to a second rezoning without the procedural due process requirements of notice and hearings. However, the court did not address the standard to be applied in such rezoning situations, nor has this issue been addressed subsequently.

Here, in accordance with *Spiker*, the Board conducted a public hearing, thereby affording the developer notice and the opportunity to be heard. The purpose of this hearing was to consider whether, in light of the developer's failure to comply with the requirements of the zoning resolution, the commercial portion of the PUD zoning should revert to its previous designation as Agriculture/Forestry.

■ At the hearing, there was ample evidence to show that the developer did not apply for final development plan approval for the commercial portion of "Outlot B" as required by the county's zoning resolution. Such deficiency was a sufficient basis to order the rezoning. *See Coleman v. Gormley,* 748 P.2d 361 (Colo.App.1987) (Planned unit development zoning, which provides for mixed uses under a single-zone umbrella, depends, not upon changed conditions, but rather upon compliance with all standards, procedures, and conditions of the zoning regulations governing PUD's).

■ Furthermore, it is only when rezoning is in violation of the master plan that there must be some change in the conditions of the neighborhood to support a zoning change. *King's Mill Homeowners Ass'n v. Westminster,* 192 Colo. 305, 557 P.2d 1186 (1976). Here, the Board received testimony that the reversionary zoning would be consistent with the county's master development plan, but that commercial zoning would not. Thus, it was not required to find a change in the character of the neighborhood before reinstating the prior zoning.

We conclude that the Board applied the proper standard in approving the reversion of this property to its prior zoning classification and that there was sufficient evidence in the record to support its decision.

## II.

The trial court noted that it would have been better practice for the planning commission, rather than the Board, to have initiated the rezoning request. Nevertheless, it held that the record did not reflect a specific prejudice to the developer, and it rejected his claim that he was deprived of a fair hearing. We agree.

■ A rezoning procedure is quasi-judicial in nature. *Western Paving Construction Co. v. Board of County Commissioners,* 689 P.2d 703 (Colo.App.1984). There is a presumption of integrity, honesty, and impartiality in favor of those serving in quasi-judicial capacities, which must be rebutted in order to establish a due

process violation. *Mountain States Telephone & Telegraph Co. v. Public Utilities Commission,* 763 P.2d 1020 (Colo.1988).

Here, although the Board was the applicant as well as the decision-maker on the rezoning decision, there is nothing in the record to show it was incapable of judging the issue fairly.

## III.

The trial court concluded that, in reversing the Board's zoning decision, it did not need to address the developer's claim that the rezoning was a confiscatory or regulatory taking giving rise to a monetary claim. Our reversal of the trial court requires us to address this issue.

■ Because zoning restricts an owner's right to use his property, it constitutes a partial taking, which is constitutionally permissible so long as it is reasonable. *Service Oil Co. v. Rhodus,* 179 Colo. 335, 500 P.2d 807 (1972).

■ However, a taking is predicated upon zoning which results in the unconstitutional deprivation of a property right without compensation. When the zoning does not deny a landowner of all economically viable use of his property or when he has not sought and been denied relief, there is no constitutional violation. *See Williamson County Regional Planning Commission v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985).

■ Here, because the developer failed to comply with the county's zoning regulations, he did not acquire the commercial zoning portion of his PUD. Accordingly, when the Board reinstated the original zoning, it was not depriving him of a property interest.

Nor is the county estopped to deny the existence of commercial zoning on a portion of "Outlot B."

■ Parties are estopped when, by their conduct, they have placed an innocent person in a position in which injury and damage would result if the parties are permitted to assume a position contrary to

■■■■■■■■■■■■■■■■

their misleading actions. *Jacobs v. Perry,* 135 Colo. 550, 313 P.2d 1008 (1957).

■■■ Here, however, the developer neither requested, nor was he granted, a building permit to commence development of his property. Furthermore, although he contracted with the county for extraction of gravel from "Outlot B," he does not contend, and the record does not show, that the gravel operation occurred in the area identified for commercial use or that it would have affected his ability to develop that area. Hence, the elements of estoppel are not present here.

Accordingly, we conclude that the developer was not unconstitutionally deprived of a property right as a result of the Board's decision to reinstate the original zoning of "Outlot B."

The judgment is affirmed as to the trial court's determination that the developer received a fair hearing, but the portion of the judgment concerning rezoning of the property is reversed, and the cause is remanded with directions to reinstate the Board's zoning decision.

JONES and DAVIDSON, JJ., concur.