**BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF BOULDER, Petitioner**

**v.**

**HYGIENE FIRE PROTECTION DISTRICT, Respondent.**

No. 09SC68.

Supreme Court of Colorado, En Banc.

Dec. 14, 2009.

Rehearing Denied Jan. 11, 2010.*

* Justice MARTINEZ, Justice COATS, and Justice EID would grant the Petition.

Harold L. Hoyt, County Attorney, Twentieth Judicial District, Pat A. Mayne, Deputy County Attorney, Boulder, Colorado, Attorneys for Petitioner.

Frascona, Joiner, Goodman & Greenstein, P.C., Joseph Adams Cope, Boulder, Colorado, Attorneys for Respondent.

Trout, Raley, Montaño, Witwer & Freeman, P.C., Peggy E. Montaño, Lisa M. Thompson, Denver, Colorado, Special District Association, Mary G. Zuchegno, Denver, Colorado, Attorneys for Amici Curiae Northern Colorado Water Conservancy District Municipal Subdistrict, Northern Colorado Water Conservancy District, and Special District Association of Colorado.

Justice HOBBS delivered the Opinion of the Court.

We granted certiorari in *Hygiene Fire Protection District v. Board of County Commissioners,* 205 P.3d 487 (Colo.App.2008), to review the court of appeals' decision that a statutory county may not refuse to process the location and extent review application of a fire protection district pursuant to section 30–28–110(1), C.R.S. (2009), of the County Planning Act ("Planning Act") because the district did not first seek modification of a planned unit development pursuant to section 24–67–106(3)(b), C.R.S. (2009), of the Planned Unit Development Act ("PUD Act").[1] We agree with the court of appeals.

Section 30–28–110(1) of the Planning Act codifies the longstanding rule that political

---

1. The issue presented for review is as follows: Whether it was error for the district court and court of appeals to find that section 30–28–110(1) of the Boulder County Planning and

Building Code exempts a fire protection district—which is planning to obtain ownership of and develop an outlot in a subdivision within a planned unit development—from the require-

subdivisions with special statutory purposes, including special districts, have a different relationship to county zoning authority than is otherwise applicable to private developments. This provision requires a political subdivision to apply to the county for location and extent review for a proposed public project, but the governing body of the political subdivision ultimately has authority to override county disapproval of the project.

The General Assembly enacted the PUD Act as a supplement to the Planning Act, not a substitute for it. We read the PUD Act provisions to function as a type of zoning regulation. We hold that the override authority of political subdivisions with special statutory purposes, codified in section 30–28–110(1) of the Planning Act, is applicable to the PUD Act. A statutory county may not refuse to process an otherwise complete application for location and extent review of a public project on the basis that the applicant political subdivision must first seek modification of a planned unit development.

## I.

The Hygiene Fire Protection District ("the District") is a special district[2] charged with

ments of section 24–67–106(3)(b) of the Planned Unit Development Act.

2. Special districts are established and governed by the Special District Act, §§ 32–1–101 to –1807, C.R.S. (2009), to "promote the health, safety, prosperity, security, and general welfare of the inhabitants of such districts and of the people of the state of Colorado." § 32–1–102(1). Fire protection districts are a type of special district "which provide[ ] protection against fire by any available means and which may supply ambulance and emergency medical and rescue services." § 32–1–103(7).

3. The named petitioner in this case, the Board of County Commissioners of the County of Boulder ("the Board"), is the body created by statute, § 30–11–103, C.R.S. (2009), to exercise the powers of the County, a political subdivision of the state of Colorado. Pursuant to its statutory authority to govern the use and development of land, see, e.g., §§ 30–28–101 to –139, C.R.S. (2009); §§ 24–67–101 to –108, C.R.S. (2009), the Board adopted a Land Use Code "to protect and promote the health, safety, and general welfare of the present and future inhabitants of Boulder County and to guide future growth, development, and distribution of land uses within Boulder County," Boulder, Colo., Land Use Code, § 1–

providing fire protection services for approximately 30,000 acres of unincorporated Boulder County ("the County").[3] The District decided to build a second fire station[4] on a parcel of privately-owned land ("the parcel") near the City of Longmont. The District intends to acquire the parcel through exercise of its power of eminent domain but has not yet initiated condemnation proceedings pending the County's acceptance and review of the District's application for location and extent review.[5] Although the District's authority to condemn the parcel pursuant to section 32–1–1002(1)(b) of the Special District Act is undisputed, the parties dispute the statutory procedures applicable to condemnation of a parcel within a planned unit development ("PUD"), as they relate to county land use authority. At the time the District identified the parcel as the site for its new station, the County was in the process of reviewing and approving a PUD containing the parcel. The District contacted the County to request that it designate the parcel for the new station within the PUD. The County refused, informing the District that it preferred the City of Longmont to provide fire protection services for the PUD.

300 (2009). The Land Use Code established the Boulder County Land Use Department ("the Department") to administer its provisions. Id. § 2–300(B)(1). For purposes of this opinion, the Department, the Board, and other county authorities collectively are referred to as "the County."

4. Currently the District serves all 30,000 acres from a single fire station located in the unincorporated town of Hygiene.

5. The District's Board of Directors adopted a resolution finding, in part, that

it is necessary to construct a fire station in the eastern portion of the district to ensure adequate fire protection to new development and residents thereof; ... it is necessary and appropriate to acquire a parcel of land upon which to construct such fire station; and ... the District has identified such a parcel of land that is suitable for location of such fire station....

Hygiene Fire Protection District, Resolution (Aug. 9, 2006). The District submitted this resolution, along with a map depicting the proposed parcel clearly located within the District's jurisdiction, as an attachment to its application for location and extent review.

The County subsequently approved and platted the PUD, with the parcel at issue platted as common open space. Both during and after PUD approval and platting, the owner of the parcel refused to negotiate with the District for its purchase. Intending to apply for location and extent review pursuant to section 30–28–110(1)(a) of the Planning Act, the District discussed with the County during its pre-application conference its plan to acquire the parcel by eminent domain. The County informed the District that, along with applying for location and extent review, the District needed to seek modification of the PUD, pursuant to section 24–67–106(3)(b) of the PUD Act.[6] Maintaining that it need only apply for location and extent review, the District submitted that application. The County refused to process the District's application because it had not first sought modification of the PUD.

The District then filed a complaint in Boulder County District Court, seeking judicial review of the County's refusal to process its application for location and extent review. The trial court granted the District's motion for summary judgment. The trial court determined that the District is a public entity not subject to zoning regulations and that a PUD is a form of zoning; therefore, the District is not subject to the PUD Act and need only comply with the location and extent review process under the Planning Act.

The court of appeals affirmed the trial court's ruling. We granted certiorari to clarify the relationship between the Planning Act and the PUD Act and, specifically, to resolve whether section 30–28–110(1)'s override authority of political subdivisions with special statutory purposes applies to the provisions of the PUD Act.

## II.

We hold that the override authority of political subdivisions with special statutory purposes, codified in section 30–28–110(1) of the Planning Act, is applicable to the PUD Act. A statutory county may not refuse to process an otherwise complete application for location and extent review of a public project on the basis that the applicant political subdivision must first seek modification of a PUD.

### A. Standard of Review

We review a grant of summary judgment de novo. *Aspen Wilderness Workshop, Inc. v. Colo. Water Conservation Bd.,* 901 P.2d 1251, 1256 (Colo.1995). Statutory interpretation is also a question of law subject to de novo review. *Fogg v. Macaluso,* 892 P.2d 271, 273 (Colo.1995).

Our primary objective in construing a statute is to effectuate the intent of the General Assembly. *Romanoff v. State Comm'n on Judicial Performance,* 126 P.3d 182, 188 (Colo.2006). We start with the plain meaning of the language, which we consider within the context of the statute as a whole. *Id.; see also* § 2–4–101, C.R.S. (2009). Where two statutes address the same subject, we construe them together to avoid inconsistency and attempt to reconcile them. *City & County of Denver ex rel. Bd. of Water Comm'rs v. Bd. of County Comm'rs,* 782 P.2d 753, 766 (Colo.1989); *People v. James,* 178 Colo. 401, 404, 497 P.2d 1256, 1257 (1972); *see also* § 2–4–206, C.R.S. (2009). Specific provisions control over general provisions. *City & County of Denver,* 782 P.2d at 766; *see also* § 2–4–206. Where the legislative intent to do so is clear and unmistakable, later-enacted general legislation may repeal by implication a preexisting specific provision. *Smith v. Zufelt,* 880 P.2d 1178, 1184 n. 9 (Colo.1994); *see also City of Colorado Springs v. Bd. of County Comm'rs,* 895 P.2d 1105, 1118 (Colo.App.1994).

### B. The Planning and PUD Acts and Other Political Subdivisions

#### 1. The Planning Act

Enacted in 1939, section 30–28–106 of the Planning Act places a duty upon county planning commissions to adopt master plans to direct the development of unincorporated lands. A 2007 amendment to the Act provides that master plans are advisory until the county makes them binding by inclusion in

---

**6.** At that time, the County also asserted that the District must submit its plan to special use review pursuant to the Boulder County Land Use Code. That issue is not before us.

its "subdivision, zoning, platting, planned unit development, or other similar land development regulations...." Ch. 165, sec. 1, § 30–28–106(3)(a), 2007 Colo. Sess. Laws 612.

Provisions of section 30–28–110(1) specifically govern the interrelationship between county zoning authority and the statutory authorities of other political subdivisions such as the fire protection district in this case. Where a county has adopted a master plan, another political subdivision proposing to construct a public building or structure in an unincorporated portion of the county must submit to the county an application for location and extent review:

> [N]o road, park, or other public way, ground, or space, *no public building or structure*, or no public utility, whether publicly or privately owned, *shall be constructed or authorized in the unincorporated territory of the county until and unless the proposed location and extent thereof has been submitted to and approved by such county or regional planning commission.*

§ 30–28–110(1)(a) (emphasis added). This location and extent review procedure provides the county an opportunity to review and approve or disapprove a proposed public project in relation to the county's master plan.

The Boulder County Land Use Code specifically provides that "the purpose of the location and extent review is to determine whether public or quasi-public utilities or uses proposed to be located in the unincorporated area of the County are in conformance with the Comprehensive Plan." Boulder, Colo., Land Use Code, § 8–100(A) (2009). In Boulder County, public and private proposals for roads, parks, public ways, grounds, and spaces, public buildings and structures, and public utilities are subject to location and extent review, which may be conducted concurrently with other discretionary county review processes. *Id.* § 8–100(B)(1)–(2). This review must be conducted in conformance

with the following procedures, applicable to a variety of actions requiring approval by the Boulder County Board of Adjustment, Planning Commission, and/or Board of County Commissioners: pre-application conference, application, referral to interested landowners and affected agencies, staff review, public review, and post-approval requirements. *Id.* §§ 3–100 to –206.[7]

■ If the planning commission disapproves an application for location and extent review, the board of county commissioners may overrule the disapproval:

> [T]he [planning] commission shall communicate its reasons to the board of county commissioners of the county in which the public way, ground, space, building, structure, or utility is proposed to be located. *Such board has the power to overrule such disapproval by a vote of not less than a majority of its entire membership.* Upon such overruling, said board or other official in charge of the proposed construction or authorization may proceed therewith.

§ 30–28–110(1)(b) (emphasis added). Location and extent review is basically a courtesy review with respect to the public projects of other political subdivisions because the governing body of the political subdivision may overrule the county's disapproval:

> If the *public* way, ground, space, *building, structure,* or utility is one the authorization or financing of which *does not,* under the law governing the same, *fall within the province of the board of county commissioners* or other county officials or board, *the submission to the [planning] commission shall be by the body* or official *having such jurisdiction, and the commission's disapproval may be overruled by said body by a vote of not less than a majority of its entire membership* or by said official.

§ 30–28–110(1)(c) (emphasis added). This provision codifies the long-standing rule that other political subdivisions may override the restrictions of county or municipal zoning

---

**7.** Pursuant to article 65.1 of the Land Use Act of 1974, §§ 24–65.1–101 to –502, C.R.S. (2009), a more comprehensive set of regulations defining county review procedures applies to "areas and activities of state interest." *See* Boulder, Colo., Land Use Code, §§ 8–200 to –601. These regulations are inapplicable to this case because a fire station does not constitute an area or activity of state interest.

regulations. *Reber v. S. Lakewood Sanitation Dist.*, 147 Colo. 70, 75, 362 P.2d 877, 879–80 (1961) (interpreting section 30–28–110(1)(c)'s predecessor, section 106–2–9(1)(c), C.R.S. (1953)); *see also Cottonwood Farms v. Bd. of County Comm'rs*, 725 P.2d 57, 59 (Colo.App.1986); Patricia E. Salkin, *American Law of Zoning* §§ 18:37, 18:44 (5th ed.2009).

 In *Cottonwood Farms*, the court of appeals characterized section 30–28–110(1)(c) as an "exemption" for public facilities from zoning regulations. 725 P.2d at 59. The parties to this action, the court of appeals' opinion below, and the issue presented on certiorari likewise characterize the provision as an exemption. We think the better interpretation of section 30–28–110(1)(c) is that it functions as part of a legislative design to coordinate the zoning authority of counties and the authority of other political subdivisions to carry out public projects. The practical effect of section 30–28–110(1) is that a public entity, such as a special district, must apply for location and extent review of a proposed project to accommodate, where feasible, the zoning interests of the county, but the governing body of that entity ultimately has authority to override county disapproval of the project. *See Blue River Defense Comm. v. Town of Silverthorne*, 33 Colo.App. 10, 14, 516 P.2d 452, 454 (1973) (also interpreting section 30–28–110(1)(c)'s predecessor).

### 2. The PUD Act

In 1972, the General Assembly enacted the PUD Act, §§ 24–67–101 to –108, "for the purpose of supplementing the provisions of [the Planning Act] ..., as the same relate to and authorize planned unit developments," § 24–67–107(6). The PUD Act grants counties and municipalities the power to authorize PUDs "[i]n order that the public health, safety, integrity, and general welfare may be furthered in an era of increasing urbanization and of growing demand for housing of all types and design," among other purposes. § 24–67–102(1); *see generally* §§ 24–67–102, –104. As defined by the General Assembly, a PUD is

an area of land, controlled by one or more landowners, to be developed under unified control or unified plan of development for a number of dwelling units, commercial, educational, recreational, or industrial uses, or any combination of the foregoing, the plan for which does not correspond in lot size, bulk, or type of use, density, lot coverage, open space, or other restriction to the existing land use regulations.

§ 24–67–103(3).

 We have described the PUD as a flexible zoning mechanism, not a zoning substitute. "The rigidity inherent in traditional Euclidian zoning has led to its increasing supplementation with more flexible zoning devices such as the PUD...." *Tri–State Generation & Transmission Co. v. City of Thornton*, 647 P.2d 670, 677 (Colo.1982). In effect, the PUD Act allows for "a unified plan of development as an alternative to traditional zoning requirements." *Bd. of County Comm'rs v. Bainbridge, Inc.*, 929 P.2d 691, 708 (Colo.1996); *see also* Edward H. Ziegler, *Rathkopf's The Law of Zoning and Planning* § 88:1 (2009) (defining a PUD as a type of zoning that allows for more flexibility than traditional zoning). Accordingly, the PUD Act functions as a type of zoning regulation.

### 3. The Role and Authorities of Other Political Subdivisions with Special Statutory Purposes

 Both counties and other public entities with special statutory purposes are political subdivisions of the state existing only for the convenient administration of the state government and created to carry out the will of the state. *Bainbridge*, 929 P.2d at 699; *Romer v. Fountain Sanitation Dist.*, 898 P.2d 37, 41 (Colo.1995). The express or implied powers of such political subdivisions are limited to those conferred by the General Assembly. *Bainbridge*, 929 P.2d at 699; *Romer*, 898 P.2d at 41. Although statutory counties have broad authority to control land use through zoning, subdivision, and PUD approval or denial, they are not superior to other political subdivisions created by the General Assembly for special purposes. *See, e.g., Bainbridge*, 929 P.2d at 698.

## C. Application to This Case

■ The Planning and PUD Acts' relationship to the relative authorities of a statutory county versus other political subdivisions with special statutory purposes is an issue of first impression for us. The County argues that the PUD Act grants it authority separate and independent from its authority to conduct location and extent review under the Planning Act. Because the County platted as common open space the parcel upon which the District plans to build the new fire station, the County asserts that the District is required to comply with the PUD modification procedure provided in section 24–67–106(3)(b) of the PUD Act and that the override provision codified at section 30–28–110(1)(c) of the Planning Act is inapplicable. We disagree.

### 1. The Planning Act Override Provision Applies to the PUD Act

We determine that the provisions of the PUD Act function as a type of zoning regulation, not as a substitute for zoning that operates separate and apart from the Planning Act. *See, e.g., Bainbridge,* 929 P.2d at 708; *Tri–State Generation & Transmission Co.,* 647 P.2d at 677. The authority of another political subdivision to override county disapproval of a public project applies as well to the PUD Act. This construction of the statutes effectuates the intent of the General Assembly in enacting both statutes.

We must construe the Planning Act and the PUD Act together to avoid inconsistency and reconcile them if possible. *City & County of Denver,* 782 P.2d at 766; *James,* 178 Colo. at 404, 497 P.2d at 1257; *see also* § 2–4–206. The two statutes can be reconciled and given effect together. Here, the General Assembly intended the PUD Act to function as a supplement to the Planning Act, not a replacement for it. § 24–67–107(6). There is no clear and unmistakable intent on the part of the General Assembly that the later PUD Act should override the specific provisions, including section 30–28–110(1)(c), of the Planning Act. *See Smith,* 880 P.2d at 1184 n. 9; *City of Colorado Springs,* 895 P.2d at 1118. To the contrary, the overall statutory design evinces legislative intent that the PUD Act

function within the rubric of the Planning Act. *See, e.g.,* § 24–67–107(4) ("Nothing in this article shall be construed to waive the requirements for substantial compliance by counties and municipalities with the subdivision requirements of [the Planning Act] ...."); § 30–28–106(3)(a) (master plans adopted pursuant to the Planning Act are made binding by inclusion in an approved PUD). In fact, the General Assembly adopted the PUD Act as part of the same chapter of the 1963 Colorado Revised Statutes as the Planning Act. Ch. 82, secs. 1–3, §§ 106–6–1 to –8, 1972 Colo. Sess. Laws 508–14 (now codified at §§ 24–67–101 to –108).

Our case law holding that PUD applications must comply with zoning regulations adopted pursuant to local governments' Planning Act authority supports our conclusion that the General Assembly intended the PUD Act to function within the requirements of the Planning Act. *See Ford Leasing Dev. Co. v. Bd. of County Comm'rs,* 186 Colo. 418, 424, 528 P.2d 237, 240 (1974) ("Planned development ... is not supposed to inject in a neighborhood a use which would otherwise not be allowed."); *Applebaugh v. Bd. of County Comm'rs,* 837 P.2d 304, 307 (Colo. App.1992) ("Planned unit development applications must meet all the standards, procedures, and conditions of the zoning regulations.").

The General Assembly is free to determine what scope of authority, limitations on authority, and coordination of the exercise of authority shall govern a statutory county and other statutory political subdivisions. In making such determinations, the General Assembly has made policy decisions we must respect. Political subdivisions must be able to exercise the powers conferred upon them by statute. The General Assembly established special districts, including fire protection districts, to "promote the health, safety, prosperity, security, and general welfare of the inhabitants of such districts and of the people of the state of Colorado." § 32–1–102(1). Political subdivisions' override authority under the location and extent review provisions assures that a county's authority to control land use does not interfere with, for example, a fire protection district's

statutory obligation to provide fire protection services—an essential public service not otherwise provided by a statutory county—pursuant to section 32-1-103(7). *See Bainbridge,* 929 P.2d at 698.

■ A political subdivision's override authority does not, however, exempt it from compliance with location and extent review. The General Assembly intended to accommodate the respective needs and interests of various types of political subdivisions, including counties and special districts. Accordingly, a county is entitled, through master planning and corresponding location and extent review, to consider interests pertaining to its zoning authority, including PUDs. As the court of appeals stated in *Blue River Defense Committee,*

> Even though the outside entity may affirmatively overrule the county's decision, the residents of the county are entitled to an opportunity to present their objections and views and to have these considered as part of the planning commission's approval or disapproval and to require that if construction is to proceed, the constructing entity must determine to proceed in the face of the county's objection. We are not prepared to say, ipso facto, that the towns' decision on the matter would be unaffected by the action of the Summit County Planning Commission.

33 Colo.App. at 14, 516 P.2d at 454.

Likewise, a fire protection district is entitled to exercise its statutory public purpose of providing fire protection services. In this case, the County's actions—refusing to honor the District's request to designate the parcel for the fire station because the County would rather the City of Longmont provide fire protection services to the PUD, platting the parcel as common open space, and subsequently refusing to accept the District's location and extent review application in the absence of a PUD modification—constitute county use of its zoning authority in a manner that frustrates the authority and duty of the District. In enacting a provision allowing other political subdivisions to override county disapproval of their public projects, the General Assembly intended to address just this sort of conflict between political subdivisions.

## 2. The PUD Act's Modification Provision

■ The County relies upon the PUD Act's modification provision, section 24-67-106(3)(b), to support its position that the District is required to seek modification of the PUD. Section 24-67-106(3)(b) provides as follows:

> Except as otherwise provided in paragraph (b.5) of this subsection (3), no substantial modification, removal, or release of the provisions of the plan by the county or municipality shall be permitted except upon a finding by the county or municipality, following a public hearing called and held in accordance with the provisions of section 24-67-104(1)(e) that the modification, removal, or release is consistent with the efficient development and preservation of the entire planned unit development, does not affect in a substantially adverse manner either the enjoyment of land abutting upon or across a street from the planned unit development or the public interest, and is not granted solely to confer a special benefit upon any person.

Contrary to the County's position, nothing in this provision functions to alter our conclusion that political subdivisions' override authority applies to the PUD Act. We must construe statutes addressing the same subject to avoid conflict and inconsistency, if possible. *City & County of Denver,* 782 P.2d at 766; *James,* 178 Colo. at 404, 497 P.2d at 1257; *see also* § 2-4-206. The General Assembly enacted the PUD Act "for the purpose of supplementing the provisions of [the Planning Act] ...." § 24-67-107(6). The General Assembly chose not to explicitly make the PUD modification provision applicable to other political subdivisions, except where, as we discuss below, the political subdivision no longer needs land platted for public use in a PUD to carry out its governmental purposes. We do not find clear and unmistakable legislative intent for the later PUD Act to repeal by implication the specific override provision codified at section 30-28-

110(1)(c). *See Smith,* 880 P.2d at 1184 n. 9; *City of Colorado Springs,* 895 P.2d at 1118.

Accordingly, we conclude that the PUD Act's modification provision, section 24–67–106(3)(b), does not apply to other political subdivisions so as to supersede their override authority under section 30–28–110(1)(c).[8] The County was not entitled to refuse to process the District's application for location and extent review on the basis that the District must first seek to modify the PUD.

### 3. The PUD Act's Enforcement Provision

The PUD Act's general enforcement provision, section 24–67–106(1), supports our interpretation of the Planning Act's relationship to the PUD Act. This provision provides as follows:

> *[T]he provisions of the plan relating to the use of land and the location of common open space* shall run in favor of the county or municipality and *shall be enforceable at law or in equity by the county or municipality without limitation on any power or regulation otherwise granted by law.*

§ 24–67–106(1) (emphasis added). The trial court cited this provision for the proposition that the General Assembly expressly disclaimed any effect county enforcement authority may have on powers or regulations granted by law to other political subdivisions. We agree with the trial court that this language, read within the statutory context as a whole, evinces legislative intent that a county's enforcement authority is circumscribed by another political subdivision's override authority, as codified at section 30–28–110(1)(c). *See Romanoff,* 126 P.3d at 188. A contrary interpretation would interfere with the District's statutory obligation to provide fire protection services, *see* § 32–1–103(7), a re-

sult we cannot effectuate absent a contrary provision enacted by the General Assembly.

### 4. · The PUD Act's Platted Public Land Change Provision

The General Assembly has specifically addressed circumstances involving PUD land platted for public use and owned by another political subdivision but no longer necessary for the political subdivision's governmental purpose. *See* § 24–67–106(3)(b.5). Added by the General Assembly in 2005, subsection (3)(b.5) details the applicable procedure where PUD land "has been set aside for a governmental use or purpose as specified in the plan" and "a governmental entity that holds legal title to the land" wishes to subdivide the land, remove or release it from use limitations, or sell it. Ch. 200, sec. 1, § 24–67–106(3)(b.5), 2005 Colo. Sess. Laws 695. The governmental entity may take such actions only after a public hearing and upon approval by the county or municipality and a finding that "all or any portion of the land is not reasonably expected to be necessary for a governmental use or purpose or that the governmental use or purpose will be furthered by disposal of the land." § 24–67–106(3)(b.5). Because this provision clearly requires county approval for a change from public ownership and use to non-governmental ownership and/or use within a PUD, the County argues that the General Assembly also must have intended that public entities be subject to county approval for new public projects, such as the new fire station in this case. We disagree.

Subsection (3)(b.5) clearly addresses only that circumstance where land owned by another political subdivision within a PUD is no longer needed to serve the public purpose for which the General Assembly created that political subdivision. The legislative history of subsection (3)(b.5) demonstrates that its enactment had nothing to do with the application of the PUD Act's provisions to public

---

**8.** The County urges us to adopt the reasoning employed in our so-called "1041" cases, arising under article 65.1 of the Land Use Act of 1974, §§ 24–65.1–101 to –502. *See, e.g., City & County of Denver,* 782 P.2d 753; *City of Colorado Springs,* 895 P.2d 1105. We decline to do so, and our opinion in no way affects existing H.B. 1041 case law. Article 65.1 encourages local governments to designate and regulate areas and

activities of state interest. *See* § 24–65.1–101(2)(b). Such areas and activities of state interest include, for example, mineral resource and natural hazard areas and site selection of water and sewage treatment facilities, airports, public transit stations, highways, and public utility facilities. §§ 24–65.1–201, –203. No such areas or activities are at issue in this case.

entities such that it would negate the location and extent review statutory procedures. Instead, the provision was a direct response to the difficulty faced by public entities in disposing of land within PUDs. *See* Hearings on H.B. 1032 before the H. Local Gov't Comm., 65th Gen. Assemb., 1st Sess. (Jan. 18, 2005). Representative Ray Rose, the author of the bill adding subsection (3)(b.5), explained the problem as follows:

> In a planned unit development, if you have [government] land that's designated for a school, or a fire station, or an emergency response entity, within that planned unit development, that land is designated for that and can't be changed, nor moved, nor manipulated in any way, shape, or form, as it is now. And in some cases it becomes apparent or mandatory that that land become moved or traded or other disposal of that land [sic].

*Id.* (testimony of Rep. Rose). The General Assembly did not intend county approval to be a significant grant of additional authority, but, rather, one of the "checks and balances" included in the provision to safeguard against its misuse. *Id.* (testimony of Rep. Rose).

If anything, the General Assembly intended this provision to limit county authority with respect to PUDs. *See* Hearings on H.B. 1032 before the S. Local Gov't Comm., 65th Gen. Assemb., 1st Sess. (Mar. 15, 2005). At the sponsor's direction, Pat Ratliff of Colorado Counties Inc. testified in support of the bill before the Senate Local Government Committee:

> [County authority to amend PUDs] is so broad, and it is so open-ended, that we believe it needed some good-government parameters—like public hearings, like finding that there is a need, like trying to give safeguards to people who buy in that PUD. ... I want you to understand, we are not in this legislation, authorizing the [county] commissioners to [amend a PUD]. ... The court is authorizing this; we're trying to contain it a little bit.

*Id.* (testimony of Pat Ratliff, Colorado Counties Inc.) (citing *Whatley v. Summit County Bd. of County Comm'rs*, 77 P.3d 793 (Colo. App.2003), *cert. denied* No. 03SC387, 2003 WL 22283858 (Oct. 6, 2003), for the broad authority given to counties to amend a PUD).

**5. The PUD Act's Liberal Construction Provision**

Finally, the County relies on section 24–67–107(6) of the PUD Act to support its argument that the District must seek modification of the PUD. That section provides that the PUD Act is to be "liberally construed in furtherance of the purposes of this article and to the end that counties and municipalities shall be encouraged to utilize planned unit developments." § 24–67–107(6). Our interpretation of the relationship between the PUD Act and the Planning Act does not contravene this provision. We are not construing the PUD Act or its particular provisions in isolation. Instead, we employ the principles of statutory construction to determine the proper relationship between the PUD Act and the Planning Act. Our holding that political subdivisions' long-standing override authority with respect to zoning regulations applies to the PUD Act furthers the explicit legislative intent that the PUD Act supplement the Planning Act and in no way discourages local governments from utilizing PUDs. We recognize the General Assembly's ongoing authority to amend the statutes governing the relationship between statutory counties and other statutory political subdivisions created to carry out state purposes.

**6. Conclusion**

Although the District has not yet initiated condemnation proceedings and its authority to condemn the parcel is undisputed, our interpretation of the Planning and PUD Acts ultimately determines which statutory procedures apply as a prelude to the District's exercise of that authority. At oral argument, the County took the position that the District can condemn the parcel but would do so subject to the use restrictions of the PUD: either the parcel would have to be used as common open space, or the District would have to seek to modify the PUD. We reject this position. For the reasons stated above, the District's override authority applies to the PUD Act.

The County does not have authority to prohibit the District from locating its fire station within the PUD for the protection of the residents therein and those in the surrounding service area within the District's jurisdiction. The General Assembly has provided the District with condemnation authority for this purpose. In the absence of the General Assembly's clear intent—an intent not expressed in the statutes at issue—Boulder County cannot preempt exercise of the District's condemnation authority by using the PUD to effectively zone out the fire station. Although Boulder County is entitled to conduct location and extent review, it may not condition acceptance of the District's application for location and extent review upon county approval of a PUD modification.

## III.

Accordingly, we affirm the judgment of the court of appeals.

Justice MARTINEZ dissents, and Justice COATS and Justice EID join in the dissent.

Justice MARTINEZ, dissenting:

I respectfully dissent in this case because, in my view, the Hygiene Fire Protection District must comply with section 24–67–106(3)(b), C.R.S. (2009), (the "enforcement provision") of the Planned Unit Development Act of 1972 ("PUD Act"), sections 24–67–101 to –107, C.R.S. (2009), before it can condemn private property and build a fire protection station in a planned unit development ("PUD"). I agree with the majority that whether section 30–28–110(1)(c), C.R.S. (2009), (the "override provision") of the County Planning Act ("Planning Act"), sections 30–28–101 to –404, also serves as an override to the PUD Act is a question of legislative intent. However, I do not agree that the General Assembly has in any way expressed an intent to allow political subdivisions to override the "innovative," "integrated," and "unified" approach to planning for "particular sites" that is encouraged by the PUD Act. *See* § 24–67–102 (PUD Act's legislative declaration).

The PUD Act creates "an alternative to traditional zoning," *Bd. of County Comm'rs v. Bainbridge, Inc.,* 929 P.2d 691, 708 (Colo. 1996), under which a county or municipality may create a comprehensive plan for land that is located within a single development district. *See* § 24–67–103(3). The PUD Act defines "planned unit development" to mean an "area of land, controlled by one or more landowners, to be developed under unified control or unified plan of development … the plan for which does not correspond in lot size, bulk, or type of use … or other restriction to the existing land use regulations." § 24–67–101(3). The Act's definition of "planned unit development" evidences the legislature's intent that PUDs be freed from traditional land use requirements and allows counties and municipalities to design PUD communities as whole coordinated units.

The PUD Act emphasizes "integrated planning" and gives counties and municipalities the authority to depart from traditional zoning standards and, in designing a single PUD, determine placement of commercial properties, residential properties, open space, and industrial properties by considering the site as a whole. The PUD Act encourages flexibility in land use planning by permitting development to be tailored "to the particular site, thereby encouraging preservation of the site's natural characteristics." § 24–67–102(1)(i); *see also Best v. La Plata Planning Comm'n,* 701 P.2d 91, 95 (Colo.App.1984) (upholding county's PUD regulations and noting that the "rigidity inherent in traditional zoning has led to its supplementation with the more flexible PUD zoning device"). Approval of every PUD must be based on a finding by the county that the proposed PUD plan is "in general conformity with … any comprehensive plan for the county." § 24–67–104(1)(f).

In order to accomplish the PUD Act's flexible approach, the PUD Act's legislative declaration states:

(1) In order that the public health, safety, integrity, and general welfare may be furthered in an era of increasing urbanization and of growing demand for housing of all types and design, the powers set forth in this article are granted to all counties and municipalities for the following purposes:

(d) To encourage innovations in residential, commercial, and industrial development and renewal so that the growing demands of the population may be met by greater variety in type, design, and layout of buildings and by the conservation and more efficient use of open space ancillary to said buildings; . . .

(e) To encourage a more efficient use of land and of public services . . . ;

(i) To provide a procedure which can relate the type, design, and layout of residential, commercial, and industrial development to the particular site, thereby encouraging preservation of the site's natural characteristics; and

(j) To encourage integrated planning in order to achieve the above purposes.

§ 24–67–102.

The majority's application of the override provision to the PUD Act serves to allow governmental entities to ignore the legislative intent that PUDs be considered as whole units when decisions are made related to the placement of structures and the siting of open space, and instead, after a PUD has been planned, insert a structure in any location the entity chooses, regardless of the overall plan of the PUD. By allowing a public entity to disregard a PUD plan, a county cannot ensure that many of the goals of the PUD Act are achieved, such as encouragement of a more efficient use of land and public services, encouragement of integrated planning, efficient use of open space, and preservation of the site's natural characteristics. Here, this interpretation has the effect of allowing the Hygiene Fire Protection District to transform the character of the already planned PUD and locate a fire station within land planned as open space. Such an interpretation cannot be what the legislature intended when it enacted the PUD Act as an alternative to traditional zoning under the Planning Act.

Instead, requiring all parties seeking to modify existing PUDs—including governmental entities—to obtain county approval of the modification under the enforcement provision achieves the legislative goal of tailoring development to particular sites through integrated planning and consideration of the development as a whole.

The General Assembly instructed courts to "liberally construe" the PUD Act in order to further the Act's purposes. § 24–67–107(6). Contrary to the legislature's intent, the majority has interpreted the enforcement provision narrowly, rendering it inapplicable when any governmental entity submits an application for location and extent review pursuant to the Planning Act. This has the effect of allowing governmental subdivisions to alter entire PUD schemes by bypassing the enforcement provision and allowing them to site structures wherever they choose, regardless of the effect the location site will have on the PUD.

The majority places significance upon the fact that section 24–67–107(6) of the PUD Act states it was enacted "for the purpose of supplementing the provisions of" the Planning Act. The majority states that use of the term "supplement" shows the two acts are to be read together and harmonized. Maj. op. at 1069. However, use of the term "supplement" does not necessarily mean that the Planning Act and the PUD Act are to be read as entirely consistent with one another, nor does it mean that the PUD Act is subordinate to the Planning Act. *Black's Law Dictionary* defines "supplement" as "supplying something additional; adding what is lacking." *Black's Law Dictionary* 1452 (7th ed.1999); *see also Webster's New College Dictionary* 1438 (10th ed.2005) (defining "supplement" as "something added, especially to make up for lack or deficiency"). Because the PUD Act is intended to "supplement" the Planning Act, the PUD Act completes and provides additional requirements applicable to PUDs not present in the Planning Act. I believe the PUD Act was enacted to "supplement" the Planning Act by providing an alternative, or different, option for counties and municipalities to apply to zoning and land use planning than contained in the Planning Act.

Under our cannons of statutory construction, where two statutes address the same subject, courts should construe them together to avoid inconsistency. *City & County of Denver ex rel. Bd. of Water Comm'rs v. Bd.*

*of County Comm'rs,* 782 P.2d 753, 766 (Colo. 1989). The majority asserts that the Planning Act and the PUD Act address the same subject and should therefore be construed together to avoid inconsistency. Maj. op. at 1069. While I agree that the two acts address the same broad subject in that they both deal with the subject of land use planning and development, I do not agree that they address precisely the same subject matter.

The Planning Act and the PUD Act are contained in different statutory titles and deal with different land use planning situations. As discussed above, the PUD Act functions fundamentally differently from the Planning Act, allowing counties and municipalities to consider an entire parcel of land and the overall characteristic of the development when designing a PUD. Moreover, master plans under the Planning Act serve as comprehensive guidelines, while the PUD Act provides the framework for instruments that actually control site-specific land use. Because I see the PUD Act and the Planning Act as addressing different situations under the broad umbrella of land use planning and development, I do not find it necessary to attempt to read the two acts as entirely consistent. I believe the better approach is to find that the override provision does not apply to the PUD Act, as it is inconsistent with the legislatively declared purpose of the PUD Act, and hold that the enforcement provision applies to all parties seeking modification of a PUD, including governmental entities.

Similarly, as applied to PUDs, the enforcement provision is more specific than the override provision, and should therefore control the outcome in the present case. *See City & County of Denver,* 782 P.2d at 766 (specific provisions control over general provisions). The PUD Act's enforcement provision applies specifically to PUDs and provides the process parties must comply with when they wish to modify an already existing PUD plan. The Planning Act applies generally to county planning commissions and requires them to adopt master plans to direct the development of unincorporated lands. The override provision allows a political sub-division to override a county who has adopted a master plan's decision related to the construction of a structure in an unincorporated area covered by the master plan. This process is distinct from the specialized procedures contained in the PUD Act under which parties seeking to modify a PUD plan must obtain approval from the county or municipality in order to assure that the modification is "consistent with the efficient development and preservation of the entire planned unit development ...." § 24–67–106(b). Furthermore, as discussed above, the PUD Act is intended to supplement the Planning Act, suggesting that it provides more specific information that was otherwise missing from the Planning Act—that is, information related to PUDs. Accordingly, I believe that the enforcement provision—a provision specifically related to modification of existing PUDs—is more specific than the override provision and should therefore control the present dispute. *See City of Colorado Springs v. Bd. of County Comm'rs,* 895 P.2d 1105, 1118 (Colo.App.1994)(holding that the more specific County Land Use Act, section 24–65.1–101, C.R.S. (1988) (repealed 2005), prevails over the "broader" override provision contained in section 30–28–110(1)(c) ).

Finally, certain provisions of the PUD Act expressly incorporate provisions of the Planning Act. For example, section 24–67–104(1)(e) of the PUD Act states that notice of a public hearing regarding approval of a PUD "shall be given in the manner prescribed by" the Planning Act. Similarly, section 24–67–105(7) of the PUD Act allows for local PUD design, construction, and other requirements to depart from zoning and subdivision requirements adopted under the Planning Act, as long as local PUD regulations "substantially comply with the subdivision provisions" of the Planning Act. *See also* § 24–67–105.5(2) (referencing section 30–28–133(10) of the Planning Act's subdivision requirements). However, no provision of the PUD Act incorporates the extent and review process of the Planning Act or the override provision. If the General Assembly intended the override provision to apply to PUDs, it could have specifically incorporated these provisions in the PUD Act, as it did in other

sections of the PUD Act. Because the General Assembly did not include a reference to the override provision within the PUD Act, I believe the General Assembly intended that all entities—including governmental entities—must comply with the enforcement provision of the PUD Act. *See Romer v. Bd. of County Comm'rs,* 956 P.2d 566, 567 (Colo. 1998) (absence of specific provisions or language in a statute "is not an error or omission, but a statement of legislative intent").

Accordingly, I would reverse the court of appeals' decision and hold that the override provision does not apply to the PUD Act. I therefore respectfully dissent.

I am authorized to state that JUSTICE COATS and JUSTICE EID join in this dissent.