**SOUTH FORK WATER AND SANITATION DISTRICT,**
Petitioner

v.

**TOWN OF SOUTH FORK,**
Colorado, Respondent.

No. 09SC840.

Supreme Court of Colorado,
En Banc.

April 25, 2011.

Norton, Smith & Keane, P.C., Charles E. Norton, J. Michael Keane, Denver, Colorado, Attorneys for Petitioner.

Karp Neu Hanlon, P.C., Karl J. Hanlon, Cassia R. Furman, Glenwood Springs, Colorado, Attorneys for Respondent.

Justice HOBBS delivered the Opinion of the Court.

We granted certiorari to review the court of appeals' judgment in *South Fork Water & Sanitation District v. Town of South Fork*, 228 P.3d 192 (Colo.App.2009).[1] This is a declaratory judgment action under C.R.C.P. 57 by which the South Fork Water and Sanitation District ("the District") attempts to prevent the Town of South Fork ("the Town") from acquiring water rights and water systems to serve its residents. A signifi-

---

1. We granted certiorari on the following issues:
 (1) Whether the Municipal Permission Statute, section 31–35–402(1)(b), C.R.S. (2010), grants South Fork Water and Sanitation District veto power over the Town of South Fork's acquisition of water rights and private systems.

 (2) Whether the court of appeals erred in holding that the District acted unreasonably in exercising its veto power under section 31–35–402(1)(b), C.R.S. (2010), and *Town of Sheridan v. Valley Sanitation District*, 137 Colo. 315, 324 P.2d 1038 (1958).

cant portion of the Town includes lands within the District's boundaries.

Section 31–35–402(1)(b), C.R.S. (2010), provides that a municipality, like the Town, or a quasi-municipal corporation formed to operate a water system, like the District, may not provide water service within the boundaries of the other without its approval. Here, throughout an extended period of existence, the District has been unable to provide water service to residents of the District, yet it attempts to prevent the Town from acquiring water rights and private water systems as part of its efforts to furnish water to its residents.

We hold, under section 31–35–402(1)(b), that a municipality cannot unreasonably withhold its approval for water service in an overlapping territorial area when it is not capable of furnishing that service and the other municipality can. Under the facts of this case, the district court did not err in refusing the District's request for declaratory relief. Accordingly, we affirm the judgment of the court of appeals.

## I.

The District is a special district and quasi-municipal corporation originally organized in 1977 to provide sewerage service. Most of the Town is within the boundaries of the District, and the District currently provides sewerage service to a large portion of the Town.

Between 2001 and 2003, the District began to develop a utility plan ("plan") that included construction of a centralized water system. The plan estimated the cost of constructing the water system at approximately $7.8 million. The Rio Grande County Commissioners approved the amended service plan in 2004.

The District took preliminary steps toward the provision of water service. It paid for its manager to be trained as a certified water system operator. It also applied for various loans and grants. But, the District failed to secure the funding necessary to build the centralized water system. Its lack of financial resources prevented it from purchasing existing private water systems in the area. The District did not budget or spend any

money on planning and constructing a centralized water system in 2004 and 2005. In 2006, a majority of voters in the District rejected its proposal to provide water services to them.

Based on these facts, the trial court found that the District lacked the financial means, ability, and intent to provide water service.

The Town is a statutory town established in 1992. Pursuant to section 31–15–708, C.R.S. (2010), it is authorized to provide water service to its residents. The current dispute arose when the Town began preparing to provide water service to its residents in 2006. As part of its efforts, the Town amended its Land Use and Development Code to require the dedication of water rights and water systems as a condition for subdivision approval. Its Board of Trustees agreed by resolution, dated December 14, 2006, to provide water service to the Town. It also negotiated three agreements for subdivisions requiring the dedication of water rights and water systems.

In 2006, the District filed a declaratory judgment complaint against the Town alleging that the Town was "furnishing water service" within the District without the District's approval, in violation of section 31–35–402(1)(b). The Town then filed a petition for exclusion from the District's boundaries pursuant to section 32–1–502, C.R.S. (2010). After more than 100 voters within the District petitioned for an election on the question of exclusion pursuant to section 32–1–502(5), the Town withdrew its petition for exclusion. In 2007 and 2008, the Town negotiated three letters of intent to acquire private water systems.

The district court found that the Town had a realistic possibility of operating a water system in the near future. It applied the precedent of *Town of Sheridan v. Valley Sanitation District*, 137 Colo. 315, 324 P.2d 1038 (1958), in construing section 31–35–402(1)(b) to require a reasonable exercise of the approval power. It found the District's withholding of approval to be unreasonable because it had no capability to provide water service yet was attempting to prevent the Town from serving its residents. The dis-

trict court concluded that the Town's police power to enact a land use code for the dedication of water rights and the acquisition of private water systems, as a condition for subdivision approval, prevailed over the District's withholding of approval.

The court of appeals ruled that the municipal water service approval power granted to municipalities by section 31–35–402(1)(b) could only be exercised in a reasonable manner. *South Fork Water & Sanitation Dist.*, 228 P.3d at 197. The court of appeals concluded the District's attempt to bar the Town from furnishing water service was unreasonable because it had neither the intent nor financial resources to provide water service itself. *Id.* at 198. It also approved of the trial court's conclusion that the Town could use its land use power to require dedications of water rights and water systems where another municipality had failed to provide water service within its territory. *Id.*

The District filed a petition for writ of certiorari, which we granted. We affirm the judgment of the court of appeals.

## II.

■ We hold, under section 31–35–402(1)(b), that a municipality cannot unreasonably withhold its approval for water service in an overlapping territorial area when it is not capable of furnishing that service and the other municipality can. Under the facts of this case, the district court did not err in refusing the District's request for declaratory relief. Accordingly, we affirm the judgment of the court of appeals.

### A.

### Standard of Review

■ We review de novo a lower court's conclusions of law. *Freedom Colo. Info., Inc. v. El Paso Cnty. Sheriff's Dept.*, 196 P.3d 892, 897 (Colo.2008). We set aside a trial court's factual findings only when they are "so clearly erroneous as to find no support in the record." *People ex rel. A.J.L.*, 243 P.3d 244, 250 (Colo.2010).

■ Statutory construction proceeds de novo. *Specialty Rests. Corp. v. Nelson*, 231

P.3d 393, 397 (Colo.2010). When construing a statute, we effectuate the intent of the General Assembly; we look to the plain meaning of the statutory language and consider it within the context of the statute as a whole. *Bly v. Story*, 241 P.3d 529, 533 (Colo. 2010). We construe the entire statutory scheme to give consistent, harmonious, and sensible effect to all parts. *Climax Molybdenum Co. v. Walter*, 812 P.2d 1168, 1174 (Colo. 1991).

■ If the statutory language is clear, we apply it. *Specialty Rests. Corp.*, 231 P.3d at 397. If the statutory language is ambiguous, we may use other tools of statutory interpretation to determine the General Assembly's intent. *Crandall v. City of Denver*, 238 P.3d 659, 662 (Colo.2010). We avoid interpretations that would lead to an absurd result. *Id.*

■ Where a contest between competing governmental entities over their relative authority threatens the provision of an essential public service to residents within overlapping boundaries, we construe the applicable statutory provisions in a manner that avoids intergovernmental conflict and inconsistency, if possible, and promotes the health and safety of the residents. *Bd. of Cnty. Commr's v. Hygiene Fire Protection Dist.*, 221 P.3d 1063, 1070 (Colo.2009).

### B.

### Powers of Special Districts

■ The General Assembly enacted the Special District Act with the intent that special districts would "promote the health, safety, prosperity, security, and general welfare" of their inhabitants and of the state of Colorado. § 32–1–102(1), C.R.S. (2010). Special districts are political subdivisions of the state that possess various proprietary powers. *Romer v. Fountain Sanitation Dist.*, 898 P.2d 37, 41 (Colo.1995); *People ex rel. Lakewood v. Haase*, 198 Colo. 47, 50, 596 P.2d 392, 394 (1979). But, they possess only those powers expressly conferred on them by the constitution or statute, as well as the incidental implied powers reasonably necessary to carry out the express powers. § 32–1–

1001(1)(n), C.R.S. (2010); *Romer*, 898 P.2d at 41.

Title 32, Article 1, Part 10 sets forth powers the General Assembly has conferred upon special districts. Two statutory sections detail the express powers conferred on water and sanitation districts. First, as a type of special district, water and sanitation districts share with other special districts those common powers set forth in section 32–1–1001, C.R.S. (2010). These include various basic powers, such as the power to enter into contracts, to control the district's business and affairs, and to "exercise all rights and powers necessary or incidental to or implied from the specific powers granted to special districts by this article." § 32–1–1001(d), (h), (n).

Second, section 32–1–1006, C.R.S. (2010), confers upon water and sanitation districts several additional powers. As pertinent to this case, many of those powers are directly related to the construction and operation of a water system. For example, subsection (1)(c)(I) gives water and sanitation districts the power to "establish, construct, operate, and maintain works and facilities across or along any public street or highway, and in, upon, or over any vacant public lands [that] are the property of the state of Colorado, and across any stream of water or watercourse." Subsection (1)(e) confers upon water and sanitation districts the power to "acquire water rights and construct and operate lines and facilities within and without the district." Finally, subsection (1)(f) confers the power of eminent domain.

## C.

### Powers of Statutory Towns

■ Statutory counties, towns, and special districts derive their powers from the General Assembly. *Hygiene Fire Protection Dist.*, 221 P.3d at 1068. We strictly construe statutes granting those powers, bearing in mind that statutory governmental entities may only exercise those powers that are expressly conferred or exist by necessary implication. § 31–15–101(2), C.R.S. (2010) (giving municipalities the "powers, authority, and privileges granted by [Title 31] and by any other law of this state together with such

implied and incidental powers, authority, and privileges as may be reasonably necessary, proper, convenient, or useful to the exercise thereof ... subject to the restrictions and limitations provided for in this title and in any other law of this state."); *Bogue*, 176 Colo. at 200, 489 P.2d at 1296.

■ Unlike special districts, the General Assembly delegated to municipalities, such as statutory towns, the general police power. § 31–15–401, C.R.S. (2010). The broad parameters of a statutory town's general police powers include, among others, the power "to do all acts and make all regulations which may be necessary or expedient for the promotion of health or the suppression of disease." § 31–15–401(1)(b). This police power to do all acts necessary or expedient to promote public health affords a municipality broad authority. *See U.S. Disposal Sys., Inc. v. City of Northglenn*, 193 Colo. 277, 280, 567 P.2d 365, 367 (1977) (concluding that city's provision of trash removal service was consistent with its police power to protect the health and general welfare of its residents under section 31–12–301, C.R.S. (1973) (recodified at 31–15–401(1)(b))).

■ In addition to the powers enumerated in section 31–15–401, the General Assembly has provided police powers to statutory towns in other sections of Title 31, Article 15. *See, e.g., Haase*, 198 Colo. at 49, 596 P.2d at 393 (recognizing that the General Assembly delegated police power to municipalities in section 31–15–702(1)(a)(II) to regulate openings in public streets for work on water mains and pipes). The police power granted to statutory cities also includes the right to impose reasonable conditions during the land use planning process designed to protect public safety and welfare. *See Bethlehem Evangelical Lutheran Church v. City of Lakewood*, 626 P.2d 668, 672 (Colo.1981) (statutory city's enforcement of building permit condition requiring installation of public improvements not unreasonable use of its police power).

## D.

### Municipal Water Service Permission Statute

Sections 31–35–401 and –402 address the operation of water and sewer systems by

municipalities, including water and sanitation districts. Although Title 31 does not generally treat special districts as municipalities, "municipality" as used in section 31–35–402 includes cities and towns as well as "any quasi-municipal corporation formed principally to acquire, operate, and maintain water facilities or sewerage facilities or both." § 31–35–401(4), C.R.S. (2010). Therefore, the powers conferred by section 31–35–402 apply to both statutory towns, like the Town, and water and sanitation districts, like the District.

Section 31–35–402(1)(b) grants permission for municipalities, including statutory towns and special districts, to furnish water to residents within and outside of their territorial boundaries. It also contains an approval authority whereby a municipality wishing to provide water service within another municipality's territorial boundaries is subject to an approval process. This section provides, in pertinent part:

> any municipality ... has the power under this part 4 ... *to operate and maintain water facilities* or sewerage facilities or both for its own use and for the use of the public and private consumers and users within and without the territorial boundaries of the municipality, *but no water service* or sewerage service or combination of them *shall be furnished in any other municipality unless the approval of such other municipality is obtained as to the territory in which the service is to be rendered.*

§ 31–35–402(1)(b) (emphasis added).

The approval authority is contained in the second clause of section 31–35–402(1)(b). The wording of this provision suggests that it may apply only to extra-territorial situations in which a municipality proposes to provide water service in areas outside of its boundaries. *See, e.g., Bennett Bear Creek Farm Water & Sanitation Dist. v. City & Cnty. of Denver,* 928 P.2d 1254, 1262–63 (Colo.1996). This would involve situations with potentially little or no conflict, in that new municipalities without water service or municipalities with inadequate water service for a growing population might invite the other municipality to provide or augment water service.

However, the language of the provision is also comprehensive enough to include overlapping territory shared by two municipalities. This situation can arise, and cause the kind of conflict exhibited by this case, because the municipal water service permission statute includes special districts, such as water and sanitation districts, within its definition. Developers in unincorporated portions of counties frequently form water and sanitation districts to provide the basic home and commercial infrastructure necessary for the initial sale of the properties. Developers who successfully complete a project frequently depart, but the special districts they formed remain in place, governed by resident-elected boards of directors who succeed the developers' chosen representatives. Unincorporated areas of counties are frequently annexed into a growing municipality. Thus, the territory of a special district may become part of a municipality in part or in whole as annexations proceed. Or a special district may be formed within a municipality to provide municipal water and/or sewer service because the municipality is not providing such service.

Because water and sewerage infrastructure is expensive to build and requires routine maintenance, the General Assembly designed section 31–35–402(1)(b) to avoid inefficient duplication of facilities and increased costs in overlapping territorial areas, such as the present case. Thus, we conclude that the statute addresses service in overlapping shared territory as well as extraterritorial service.

There is no statutory procedure or specified administrative mechanism implementing the approval process. In lieu thereof, these conflicts and their resolution have surfaced in litigation. Our cases involving a predecessor version of the municipal water service permission statute arose in the context of extraterritorial areas. At the time we decided *Town of Glendale v. City & County of Denver,* 137 Colo. 188, 322 P.2d 1053 (1958), the statute addressed sewerage service and had not been broadened to address water service. The then-existing approval clause of the statute provided that "no sewerage facilities shall be operated in whole or in part in any other

municipality unless the approval of such other municipality in the territory in which the facilities will be located is obtained." § 139–52–2(2), C.R.S. (1953).

In *Glendale,* Denver initiated condemnation of land and easements it needed for construction and operation of a sewer system. 137 Colo. at 189, 322 P.2d at 1054. Glendale claimed that the approval clause required its permission for Denver to condemn any land or easements in Glendale. *Id.* at 190, 322 P.2d at 1054. We held that Glendale could not use this authority to prevent Denver from using its power of eminent domain. *Id.* at 195, 322 P.2d at 1057. Nevertheless, we also concluded that Glendale could reasonably require Denver to comply with local ordinances requiring healthy, safe construction methods. *Id.*

In *Town of Sheridan v. Valley Sanitation District,* 137 Colo. 315, 321, 324 P.2d 1038, 1041 (1958), we further construed the approval clause's predecessor. In *Sheridan,* the Town of Sheridan ("Sheridan") refused to consent to Valley Sanitation District's ("Valley") construction of a sewer line across two public streets in Sheridan, because Valley would not agree to its demands for heavily subsidized sewer service within the town. *Id.* at 316, 318, 324 P.2d at 1039, 1040. Valley then sought to use its statutorily granted power of eminent domain to condemn easements across those streets for the construction and maintenance of the sewer line. *Id.*

At issue was whether the approval clause allowed Sheridan to exact a financial benefit. *Id.* at 321–22, 324 P.2d at 1041–42. Following our precedent in *Glendale,* 137 Colo. 188, 322 P.2d 1053, we held that the approval authority was limited to "a reasonable exercise thereof consistent with the police power in the protection of the health, safety, and welfare" of Sheridan's residents. *Sheridan,* 137 Colo. at 321, 324 P.2d at 1041.

### E.

### Application to this Case

### 1. The District Must Act Reasonably in Exercising the Approval Authority

The Town and the District agree that the District is a "municipality" for the purposes of section 31–35–402(1)(b). Pursuant to the statute, the District argues that it must approve the Town's furnishing of water service in the territory that falls within the overlapping territory of both the Town and the District. The Town counters that the District cannot exclude it from furnishing water service to its residents in the overlapping territory because the District has not furnished such service in the past and has not shown itself capable of doing so.

In construing the statute, we must give effect to the entire provision. *See Climax Molybdenum Co.,* 812 P.2d at 1174 (construing statutory scheme to give consistent, harmonious, and sensible effect to all its parts). The plain language of section 31–35–402(1)(b) commences with permission for each entity "to operate and maintain water facilities ... for its own use and for the use of public and private consumers and users within and without its territorial boundaries."

The next clause plainly addresses the furnishing of water service: *"no water service ... shall be furnished* in any other municipality unless the approval of such other municipality is obtained as to the territory *in which the service is to be rendered."* § 31–35–402(1)(b)(emphasis added). According to the plain language of the statute, in overlapping shared territory, each municipality has authority to withhold approval of the other's provision of service within that territory. However, read together, both clauses promote the rendering of an essential service to residents. They do not contemplate residents going without water service based solely on assertions of territorial primacy by an entity that is not rendering water service and has not shown itself capable of doing so.

Thus, contrary to the District's assertions, and consistent with *Sheridan* and the legislative intent that section 31–35–402 promote rather than prohibit the provision of an essential service, the approval authority is not unlimited. *See Sheridan,* 137 Colo. at 321, 324 P.2d at 1041. The approval authority must be exercised reasonably. The District argues that changes to the approval clause's statutory phrasing negate application of the principle we announced in *Sheridan.* Specif-

ically, it argues that the General Assembly's substitution of "no ... service ... shall be *furnished*" for "no ... *facilities* shall be *operated*" shows the General Assembly's intent to address a different problem than originally addressed by the approval provision's predecessor. *See* § 31–35–402(1)(b); § 139–52–2(2), C.R.S. (1953). We disagree with this reading of legislative history.

"Furnishing water service" necessarily implies "operation of facilities."[2] We conclude that our rationale in *Sheridan* governs the contours of the District's approval authority over the Town's provision of water service in the overlapping territory. *See Sheridan*, 137 Colo. at 321, 324 P.2d at 1041.

■ In *Sheridan*, we held that the approval authority is subject to a reasonable exercise of municipal authority. 137 Colo. at 322, 324 P.2d at 1042. The authority the General Assembly has granted to special districts is calculated to "promote the health, safety, prosperity, and general welfare" of their inhabitants, and the exercise of their powers should be consistent with that purpose. § 32–1–102(1).

### 2. The District Unreasonably Attempted to Exercise the Approval Authority

■ The District cannot unreasonably withhold its approval to prevent the furnishing of water service to residents in the overlapping territory. Although the District invokes the approval authority based on its asserted concern for the well-being of the inhabitants of the overlapping territory, the rationale it presented to the trial court focused on (1) its alleged primacy as the only entity authorized to provide water service within its territory, (2) its concern that the Town's efforts would adversely affect its ability to obtain financing for its planned water system, and (3) its objection that the Town was "poaching" on its service territory.

The district court found that, although the District has been authorized to provide water service since 1994, it has not done so and has

not demonstrated the capability to do so. Finding 7 of the court recites:

The District does not in fact:

a. presently own or operate a water system;

b. own, nor has it ever operated a water system in the past;

c. provide water service to anyone at the present time, nor has it ever provided water to any party in the past;

d. own water rights, nor has it ever owned water rights or provided water service to any resident in the relevant service area.

Finding 22 recites:

The District lacks the financial resources to implement a water system. There is no evidence that this will change at any point in the future.

Finding 25 recites:

The evidence presented indicates that the District has no ability or intent to pursue or implement a municipal water system.

In contrast, the district court found that the Town has a realistic possibility of operating a water system in the near future. As part of its subdivision approval process, it signed three agreements requiring the dedication of water systems to the town. In addition, it signed three letters of intent to acquire currently operating private water systems. The district court concluded that "[t]here is a substantial void in water service in the Town of South Fork because such service has not been provided by the District. The Town is capable of filling that void and is therefore entitled to provide water service within the co-terminus boundaries."

Evidence in the record supports the district court's findings. Although the District took preliminary planning steps towards furnishing water service, it failed to budget funds for acquiring water rights and building a water supply system. Under these circumstances, we conclude that the District cannot prevent the Town from exercising its police

---

2. The approval clause's predecessor allowed municipalities to "operate and maintain" sewer facilities for users "within and without [its] territorial boundaries." § 139–52–2(2), C.R.S. (1953).

Therefore, a municipality could furnish sewerage service to residents within another municipality's territory.

and land use power to promote public health and to regulate the distribution and supply of water to its own residents, within its own territory. *See* § 32–1–102(1) (explaining the purposes of special districts); § 31–15–708(1)(a), (c), C.R.S. (2010) (granting towns power to regulate the distribution and supply of water); § 31–15–401(1)(b); *Haase,* 198 Colo. at 49–50, 596 P.2d at 393–94 (recognizing that the General Assembly may delegate police power to statutory city, and concluding that statutory city's police power was superior to special district's proprietary authority to construct and maintain water facilities along public streets).

The District's declaratory judgment action sought relief barring the Town from acquiring water rights and operating water systems within the overlapping territory without the District's express permission. We agree with the district court and the court of appeals that the Town acted within its land use and police power authority to impose reasonable conditions on the subdivision approval process in order to protect public health, safety and welfare.[3] § 31–15–401(1)(b)(granting town police power "to do all acts and make all regulations which may be necessary or expedient for the promotion of health or the suppression of disease"); *see Bethlehem Evangelical Lutheran Church,* 626 P.2d at 672–73.

 The District argues that the sole remedy the Town has for providing water service to its residents is to petition for exclusion from District water service pursuant to section 32–1–502, C.R.S. (2010). The Town responds that it need not petition for exclusion from the District for water service that the District has not provided and has not shown itself capable of providing. We agree.

Here, the Town is not seeking to alter the boundaries of the District that lie within the Town because the District is providing sewerage service to the Town. Under section 32–1–502(2)(a)–(b), C.R.S. (2010), if the District were providing water service to the Town in addition to the sewerage service, the Town would be required to proceed through an exclusion process in order to substitute itself as the water service provider:

(2) Subject to the provisions of subsection (5) of this section, the court shall hold a hearing on the petition and order the territory described in the petition or any portion thereof excluded from the special district *if the following conditions are met*:

(a) The governing body of the municipality agrees, by resolution, *to provide the service provided by the special district to the area* described in the petition on and after the effective date of the exclusion order.

(b) *The service to be provided by the municipality will be the service provided by the special district in the territory described* in the petition for exclusion.

(emphasis added). The remaining provisions of this section address the disposition of assets and continuation of service to all areas of the special district, see section 32–1–502(2)(c), and the transfer of district facilities, the service of bonded indebtedness and the formulation of a single plan for service without impairing the quality of the existing service the district is providing, see section 32–1–502(2)(d).

Thus, the plain language of section 32–1–502 addresses exclusion from service a special district is providing. Here, where the District is providing sewerage service but not water service and has not shown itself capable of providing water service, section 32–1–502 is inapplicable.

Without water there is no life. Pursuant to its delegated powers to provide water service, promote the health of its own residents, and regulate land uses, the Town reasonably initiated the provision of water service to residents in the overlapping territory of the Town and the District. The District

---

3. Underscoring the interconnection between water supply and land use that we note here, the General Assembly has adopted legislation addressing local government water supply decision-making in connection with new development permit applications. §§ 29–20–301 to –306, C.R.S. (2010). *See Pagosa Water & Sanitation Dist. v. Trout Unlimited,* 219 P.3d 774, 786 (Colo. 2009); Dan Tarlock, *How Well Can Water Law Adapt to the Potential Stresses of Global Climate Change?,* 14 U. Denv. Water L.Rev. 1, 36–42 (2010).

sought to unreasonably withhold its approval for the Town's furnishing of water service.

The General Assembly intended a just and reasonable result when enacting the municipal water service permission statute. Furthering rather than frustrating the provision of an essential service to residents is a significant legislative policy underlying section 31–35–402(1)(b).[4] *See Hygiene Fire Protection Dist.*, 221 P.3d at 1070. The district court did not err in refusing the requested declaratory relief the District sought in this case.

## III.

Accordingly, we affirm the judgment of the court of appeals.

Justice EID dissents, and Justice COATS joins in the dissent.

Justice EID, dissenting.

The majority views this case as a conflict between the town and the district over which entity is better equipped to provide a water system to the residents of South Fork—a conflict that it must resolve, or the residents will go without water. Maj. op. at 468, 472–73. Yet the legislature has expressly set forth a non-judicial remedy for precisely this sort of situation. When a municipality (here, the town) wishes to proceed with a water system over the objection of another municipality with whom it shares a service area (here, the district), it may do so by petitioning to exclude the shared territory from the other municipality. § 32–1–502, C.R.S. (2010).

Because the majority's "pick a winner" approach nullifies the legislature's exclusion remedy, I respectfully dissent from its opinion.

Under the municipal permission statute, section 31–35–402(1)(b), C.R.S. (2010), a municipality has the power to operate a water system "within and without the territorial boundaries of the municipality," but "no water service ... shall be furnished in any other municipality unless the approval of such other municipality is obtained as to the territory in which the service is to be rendered." I agree with the majority that this statute requires the town to obtain the approval of the district before it operates a water system in a service area they share in common.[1] I disagree, however, with the majority's holding that the district cannot withhold its approval under the circumstances of this case.

Importantly, the statute on its face places no restrictions on the grounds for which a municipality may withhold its approval. The majority relies on *Town of Sheridan v. Valley Sanitation Dist.*, 137 Colo. 315, 324 P.2d 1038 (1958), to hold that the district's actions constituted an unreasonable exercise of the veto power. In *Town of Sheridan*, we recognized the unqualified nature of the approval language, but found that such an "absolute [statutory] right of veto on the part of a municipality" presented an "irreconcilable conflict" with the exercise of constitutional eminent domain authority by another municipality. *Id.* at 322, 324 P.2d at 1042. There,

4. To that end, we note that the General Assembly has expressly authorized cooperation between political subdivisions like the Town and the District: "Governments may cooperate or contract with one another to provide any function, service, or facility lawfully authorized to each of the cooperating or contracting units, including the sharing of costs, the imposition of taxes, or the incurring of debt." § 29–1–203(1), C.R.S. (2010). Both the Town and the District should act in the best interests of the health, safety, and welfare of their residents. Cooperating with one another pursuant to the authority contained in section 29–1–203(1) would ensure protection of those interests.

1. Like the majority, I too would reject the town's argument that would limit the approval require-

ment to only those situations in which a municipality seeks to provide service outside of its territorial boundaries. Maj. op. at 470–71; § 31–35–402(1)(b). The first clause of the statute permits a municipality to operate water facilities "within and without the territorial boundaries of the municipality." The second clause limits that authority by stating that "no water service ... shall be furnished in any other municipality" without the other municipality's approval. Read together, a municipality's authority to provide water service is subject to the approval of any other municipality with co-existent territory within and without the municipality's territorial boundaries. If the intent of the statute was to limit the approval requirement to extraterritorial service, as the town argues, the language of the second clause would read "in any other municipality *beyond the municipality's territorial boundaries.*"

a town withheld its approval from a sanitation district that sought to condemn rights of way and easements through two public streets of the town to construct a sewer line. We noted that it was our duty to interpret the municipal permission statute consistent with the grant of condemnation authority to the district, which, by its nature, is exercised "without the consent of the [property] owner." *Id.* at 322, 324 P.2d at 1041–42 (emphasis omitted). "If a reasonable interpretation . . . that will avoid constitutional conflict . . . is at hand," we observed, "we should adopt it." *Id.* at 321, 324 P.2d at 1041. In reconciling the district's eminent domain authority with the town's statutory right to withhold its approval, we held that the town must exercise its veto power of the proposed condemnation consistent with "a proper exercise of [its] police powers," for example, "it may require reasonable, safe and healthful construction methods." *Id.* at 321, 324 P.2d at 1041.

We found, however, that the town had withheld its approval not out of a "concer[n] with either the health, welfare or safety of [its] inhabitants," but rather in an effort to extract "exorbitant demands" from the sanitation district, including that it furnish taps to the entire town at a fee set by the town, not the district. *Id.* at 317, 322, 324 P.2d at 1040, 1042. We held that a municipality cannot engage in such rent-seeking behavior pursuant to the police power. *Id.* at 322, 324 P.2d at 1042. Ultimately, we concluded that the municipal permission statute "recognize[d] the inherent power of a municipality to exercise its police power reasonably to protect its inhabitants," which the town had not done. *Id.* at 322, 324 P.2d at 1042.

This case simply does not implicate the concerns we identified in *Town of Sheridan,* as the district is not attempting to withhold its approval of an exercise of the town's eminent domain power. Moreover, even if *Town of Sheridan* applies to this case, the appropriate inquiry is whether the district withheld its approval of the town's water project reasonably—i.e., consistent with the police power to protect the health, safety, and welfare of the inhabitants of the municipality—or whether it was attempting to extract unreasonable concessions. Here, that standard is easily met: the district believes that the centralized water system it proposes will better serve the residents of South Fork than the piecemeal system that the town seeks to operate. *See* § 32–1–102(1), C.R.S. (2010) (creating special districts to "promote the health, safety, prosperity, security, and general welfare" of their inhabitants). Unlike the situation in *Town of Sheridan,* the district is not pressing the town to make unreasonable financial concessions, nor is it attempting to obtain below-market service for its residents. The town and the district simply have a disagreement over how to accomplish the goal of furnishing a water system to their inhabitants.

The majority, however, stretches *Town of Sheridan* far beyond its roots to couch reasonableness as a contest of willingness and ability, holding that it was unreasonable for the district to withhold its approval of the town's proposed system because the town is better equipped to provide a system. The majority therefore turns *Town of Sheridan* into something akin to a "can and will" test, but with a competitive aspect. *See generally Pagosa Area Water & Sanitation Dist. v. Trout Unlimited,* 170 P.3d 307, 316 (Colo. 2007) (enumerating factors to be considered in determining whether a water district "can and will" complete a water project with diligence and within a reasonable time). It declares the town the "winner," as it has a "realistic possibility of operating a water system in the near future." Maj. op. at 472. Indeed, "[a]s part of its subdivision approval process . . . [the town] signed three agreements requiring the dedication of water systems to the town," and it signed three letters of intent for the acquisition of private water systems, although two have since expired. *Id.* The district, by contrast, "took preliminary planning steps toward furnishing water service," but "failed to budget funds" for building the system. *Id.* Town residents need water, the majority concludes, and the town should provide it by whatever means necessary. *Id.* at 473–74.

Neither the statute nor *Town of Sheridan* contemplates that a district court should sit in judgment of districts' competing water

**476**

system proposals. In fact, such a judicial "pick a winner" approach is entirely inconsistent with the goal of the municipal permission statute, which is "to avoid inefficient duplication" of effort in building facilities. Maj. op. at 470–71. Under the majority's approach, a district will necessarily need to invest in the creation of a water system to maintain priority over another district with which it overlaps. To put it differently, overlapping districts each will have to take substantial steps toward building a water system, or risk being preempted by the other district. *Pagosa*, 170 P.3d at 316 (describing the "can and will" test). The "can and will" test makes sense when districts work cooperatively to build a water system, *see, e.g., Pagosa*, 170 P.3d at 310–11, but it has no place in a case such as this, where such cooperation is lacking.

The majority posits that, if the judiciary fails to step in, the conflict between the town and the district will continue, and the town's residents will be without water. Maj. op. at 473.[2] Yet the legislature has crafted a non-judicial remedy for this very situation. Section 32–1–502 provides an exclusion remedy, under which a municipality may exclude itself from the territory of a special district. In this case, the town's Board of Trustees initiated exclusion proceedings by filing a petition in district court, but later abandoned the proceedings when residents of the town petitioned that a special election be held on the question. § 32–1–502(5)(a); maj. op. at 467–68. In its First Amended Answer, the town noted that due to "recent election results, information in recent local news media, and representations of citizens of the District," it was in the best interest of the town's inhabitants to withdraw the petition for exclusion. The town's inability to rally sufficient citizen support for exclusion proceedings, however,

does not provide a justification for the creation of a substitute judicial remedy.[3] Because the majority creates a judicial remedy where a statutory remedy already exists, I respectfully dissent from its opinion.

I am authorized to state that Justice COATS joins in this dissent.

---

**2.** The town's water needs are currently being served by individual wells or by small private community systems maintained by local water providers, as the majority implicitly acknowledges. Maj. op. at 472 (noting that the town has "signed three letters of intent to acquire currently operating private water systems").

**3.** The town's initiation of exclusion proceedings demonstrates that, contrary to the majority's sug-

gestion, maj. op. at 473, the town understood that exclusion was the proper remedy in this situation. The majority mistakenly suggests that the language of section 32–1–502 contains an "existing service" requirement. *Id.* at 473–74. In fact, the language contains no such requirement, permitting "any municipality wherein territory within a special district is located ... [to] petition the court for exclusion of the territory described in the petition from the special district." § 32–1–502(1)(a).