COLORADO COURT OF APPEALS                                    2016COA144

Court of Appeals No. 15CA0765
Weld County District Court No. 13CV30928
Honorable Julie C. Hoskins, Judge

Bill Barrett Corporation and Bonanza Creek Energy, Inc.,

Plaintiffs-Appellees and Cross-Appellants,

and

Noble Energy, Inc.,

Plaintiff-Appellee,

v.

Sand Hills Metropolitan District, f/k/a Altamira Metropolitan District No. 6;
United Water and Sanitation District; and Town of Lochbuie,

Defendants-Appellants and Cross-Appellees.

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division VI
Opinion by JUDGE FOX
Bernard and Richman, JJ., concur

Announced October 6, 2016

Davis Graham & Stubbs LLP, R. Kirk Mueller, Mark E. Champoux, Denver,
Colorado, for Plaintiffs-Appellees and Cross-Appellants

Hogan Lovells US LLP, Scot W. Anderson, Elizabeth H. Titus, Denver, Colorado,
for Plaintiff-Appellee

Waas Campbell Rivera Johnson & Velasquez LLP, Darrell G. Waas, Mikaela V.
Rivera, Kathryn I. Hopping, Denver, Colorado, for Defendants-Appellants and
Cross-Appellees

Collins Cockrel & Cole, Eric C. Jorgenson, Denver, Colorado, for Amicus Curiae Special District Association of Colorado

¶ 1     Sand Hills Metropolitan District (the district), United Water and Sanitation District,[1] and the Town of Lochbuie (Lochbuie), Colorado (collectively Sand Hills) appeal the trial court's partial grant of motions for summary judgment filed by Bill Barrett Corporation and Bonanza Creek Energy, Inc. (collectively Taxpayers).[2] Taxpayers cross-appeal the trial court's partial grant of Sand Hills' motion for summary judgment. We affirm in part, reverse in part, and remand to the trial court.

## I.     Background

¶ 2     The district was originally organized in 2004 as Altamira Metropolitan District No. 6 (Altamira District). When organized, the district's boundaries were entirely within Lochbuie. On October 6, 2004, Lochbuie approved a proposed service plan (the 2004 plan), and the Weld County District Court issued an order and decree organizing the district.

---

[1] United Water and Sanitation District is a special district whose president, Bob Lembke, also owns 70 Ranch, LLC. Lembke is also a member of the Sand Hills Metropolitan District (formerly Altamira District, No. 6) Board of Directors.

[2] Noble Energy, Inc. (Noble) was added to the amended complaint as an involuntary plaintiff and is an involuntary plaintiff-appellee here.

1

¶ 3    According to the 2004 plan, the purpose of the district was to "finance the construction of local and regional public improvements for the use and benefit of the Altamira Development's residents and taxpayers." The plan also required the district to "provide for maintenance of certain public improvements." Specifically, the plan proposed "the construction, acquisition and installation of local and regional public improvements, including streets and traffic signals, and water, sewer, storm drainage and park and recreation facilities . . . for the Altamira Development." The Altamira Development was to include 1496 single family homes and 70,000 square feet of commercial space within Lochbuie's boundaries. The development never occurred.

¶ 4    70 Ranch, LLC (70 Ranch) owns 13,000 acres located approximately 30 miles northeast of Lochbuie in unincorporated Weld County. In 2009, the district purported to include the 70 Ranch property within its boundaries. The district's board of directors approved the inclusion, and the Weld County District Court issued an order granting the inclusion on April 29, 2009. In 2010, the district changed its name from the Altamira District to the Sand Hills Metropolitan District. Then, in 2011, the district

excluded from its boundaries all of the land, located in Lochbuie, that originally comprised the Altamira District. The district's board of directors approved the exclusion, and the Weld County district court issued an order granting the exclusion on April 28, 2011. Through this sequence of actions, the district relocated itself from Lochbuie to encompass only the 70 Ranch property. The district did not give notice to, or seek approval from, the Board of County Commissioners of Weld County.

¶ 5      Taxpayers and Noble are oil and natural gas exploration companies that lease mineral interests at 70 Ranch. 70 Ranch owns some, but not all, of the subsurface mineral rights below the 70 Ranch property. 70 Ranch leases its mineral rights to Taxpayers, and Taxpayers also lease subsurface mineral rights below the 70 Ranch property from other mineral estate owners.

¶ 6      In 2008, the district's board of directors approved certification of a mill levy of 51.118 mills for the district's general operating expenses. Since 2009, when 70 Ranch was included, Taxpayers have paid millions of dollars in ad valorem taxes to the district.

¶ 7      Despite the district's 2009 and 2011 actions, it did not prepare a revised service plan until 2013 (the 2013 plan) to reflect its new

location and adjusted purpose. The 2013 plan acknowledges the district's 2009 and 2011 geographical shift to the 70 Ranch property in Weld County and articulates its new purpose to provide "an important site for water facilities and storage." The 2013 plan indicates that the district "will provide for the construction, acquisition and installation of local and regional public improvements, including streets and traffic signals, and water, sewer, storm drainage and park and recreation facilities." The plan reiterates an intent to provide for the improvements (costing approximately $19,315,008.90) as contemplated by the Altamira District in Lochbuie. The 2013 plan states the district's intent "to cooperate with other local governments, authorities and enterprises to develop infrastructure resources of benefit on a regional basis." The plan lists examples of the district's potential regional reach, including repairing and reconstructing Lake Henry (in Lochbuie), constructing various water truck depots in Weld County, constructing a water pipeline in Weld County, and constructing a reservoir and recharge site in Weld County. The 2013 plan states, however, that the district is not obligated to complete any of these potential improvements.

4

¶ 8    Taxpayers sued Sand Hills in 2013 claiming that Sand Hills exceeded its authority and violated parts of the Special District Act, §§ 32-1-101 to -1807 (the Act), C.R.S. 2016, and the Colorado Constitution.  Taxpayers moved for partial summary judgment and Sand Hills cross-moved for summary judgment.

¶ 9    In a detailed written order, the trial court found:

- After April 28, 2011 — when the district unilaterally removed itself entirely from Lochbuie — the district lost its legal authority to collect taxes.  Thus, the trial court granted Taxpayers' motion for partial summary judgment with respect to any district actions taken after that date.

- Taxpayers are entitled to a tax refund for taxes paid for tax years 2011, 2012, and 2013.

- From April 29, 2009, until April 28, 2011 — when the district's boundaries included the 70 Ranch property and the original Altamira District property — the district had the authority to tax Taxpayers.  Thus, as to this time period, the trial court granted Sand Hills' motion for summary judgment.

¶ 10    Sand Hills and Taxpayers appeal the adverse components of the trial court's order on their respective motions.

## II.     Special District Taxing Authority

¶ 11     Sand Hills contends that the trial court erred in concluding that the district lost authority to tax when it relocated itself in 2011 to encompass only the 70 Ranch property.  On cross-appeal, Taxpayers argue that the trial court erred in concluding that the district had authority to impose taxes on their mineral interests from 2009 until 2011, when the district's geographic boundary expanded to include the 70 Ranch property.

### A.     Preservation and Standard of Review

¶ 12     The parties agree that the relevant arguments were preserved for appeal.

¶ 13     We review de novo a trial court's order granting summary judgment.  *Lewis v. Taylor*, 2016 CO 48, ¶ 13.  "Summary judgment is appropriate only if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Id.* (quoting C.R.C.P. 56(c)).

¶ 14     Additionally, we review questions of statutory interpretation de novo.  *Id.* at ¶ 14.  When construing a statute, we effectuate the

intent of the General Assembly by looking to the plain meaning of the statutory language and considering it within the context of the statute as a whole. *Bly v. Story*, 241 P.3d 529, 533 (Colo. 2010). We construe the entire statutory scheme to give consistent, harmonious, and sensible effect to all parts. *Climax Molybdenum Co. v. Walter*, 812 P.2d 1168, 1174 (Colo. 1991). And, we avoid interpretations that would lead to an absurd result. *Crandall v. City & Cty. of Denver*, 238 P.3d 659, 662 (Colo. 2010). If the statutory language is clear, we apply it as written. *Specialty Rests. Corp. v. Nelson*, 231 P.3d 393, 397 (Colo. 2010). If the statutory language is ambiguous, we may use other tools of statutory interpretation to determine the General Assembly's intent. *Crandall*, 238 P.3d at 662.

## B.     Applicable Law

¶ 15    The Act was enacted "with the intent that special districts would 'promote the health, safety, . . . and general welfare' of their inhabitants and the state of Colorado." *S. Fork Water & Sanitation Dist. v. Town of South Fork*, 252 P.3d 465, 468 (Colo. 2011) (quoting § 32-1-102(1), C.R.S. 2016). Special districts possess only those powers expressly conferred upon them. *Id.*

7

¶ 16    As relevant here, the Act provides:

> The board of county commissioners of each county which has territory included within the proposed special district, other than a proposed special district which is contained entirely within the boundaries of a municipality, shall constitute the approving authority under this part 2 and shall review any service plan filed by the petitioners of any proposed special district.

§ 32-1-203(1), C.R.S. 2016. Moreover, sections 32-1-201 to -209, C.R.S. 2016, apply "except where a petition for the organization of a special district confined exclusively within the boundaries of any existing municipality has been approved by a resolution of the governing body of the municipality." § 32-1-201.

¶ 17    And, section 32-1-207, C.R.S. 2016, provides the procedures governing when and how a special district may alter its service plan. A special district's governing body may make material modifications — changes of a basic or essential nature — to its previously approved service plan only "by petition to and approval by the board of county commissioners or the governing body of the municipality." § 32-1-207(2)(a). The "inclusion of property that is located in a county or municipality with no other territory within

8

the special district may constitute a material modification of the service plan." *Id.*

## C. Analysis

¶ 18    Because this statutory scheme is clear and unambiguous, our analysis focuses on applying the plain meaning of the Act. *Nelson,* 231 P.3d at 397.

¶ 19    Section 32-1-207(2)(a) includes a nonexhaustive list of factors specifying when a district's modification of its service plan is considered material and requires a petition to and approval from the board of county commissioners.

> [A]pproval of modifications shall be required only with regard to changes of a basic or essential nature, including but not limited to the following: Any addition to the types of services provided by the special district; a decrease in the level of services; a decrease in the financial ability of the district to discharge the existing or proposed indebtedness; or a decrease in the existing or projected need for organized service in the area. Approval for modification shall not be required for changes necessary only for the execution of the original service plan or for changes in the boundary of the special district; except that the inclusion of property that is located in a county or municipality with no other territory within the special district may constitute a material modification of the service plan[.]

§ 32-1-207(2)(a).

¶ 20 The relevant facts are not in dispute. We must determine whether the district modifications at issue here — the 2009 addition of the 70 Ranch property (outside of Lochbuie and within Weld County) and the 2011 complete geographic shift to the 70 Ranch property (removing all Lochbuie property) along with the district's shift from a local focus with the purpose of providing local necessities for the construction of the Altamira Development to a regional focus providing services beyond Lochbuie's boundaries — exceeded the scope of the 2004 plan and constituted material modifications requiring the approval of the Board of County Commissioners of Weld County.

### 1. The District's 2011 Actions

¶ 21 We begin by discussing the district's complete geographic shift in 2011 when the district removed itself entirely from Lochbuie so that its geographical area included only the 70 Ranch property — thirty miles northeast in unincorporated Weld County. Although that geographic shift alone was a major change to the district, it was not until 2013 that (1) the district attempted to amend the 2004 plan; and (2) Lochbuie's Town Board purported to approve the

2013 plan, adopting a focus on regional water infrastructure. It is undisputed that Sand Hills had not built any of the improvements associated with the Altamira Development described in the 2004 plan.

¶ 22    The trial court concluded that the district's failure to comport with the purposes of the 2004 plan along with the district's complete geographic overhaul in 2011 constituted a material departure from the original service plan under section 32-1-207(2)(a). We agree.

¶ 23    First, the district's shift in purpose, reflected in the 2013 plan, from a localized district providing for residential and commercial development in Lochbuie to a regional district reaching beyond Lochbuie and providing regional benefits to the county constituted a change to the basic and essential nature of the 2004 plan. *See* § 32-1-207(2)(a); *see also Upper Bear Creek Sanitation Dist. v. Bd. of Cty. Comm'rs*, 715 P.2d 799, 800 (Colo. 1986) (stating that appropriate board of county commissioners was required to approve a modified service plan). The 2011 geographical shift also completely altered the area subject to the district's taxation authority and changed the basic and essential nature of the 2004

plan. *See* § 32-1-207(2)(a). To adopt such a modification, the district needed approval from the appropriate governing authority. *Id.*

¶ 24 Under section 32-1-203(1), and after the geographical shift to the 70 Ranch property, the only proper governing authority to approve the proposed departure from the district's service plan was the Board of County Commissioners of Weld County. § 32-1-203; *see also Upper Bear Creek*, 715 P.2d at 800. In order to properly adopt the belated 2013 plan — which, as the trial court noted, effectively sought retroactive approval for the district's actions (including taxation) after the 2011 geographic shift — the district needed approval from the board of county commissioners of each county with territory in the district. *See* § 32-1-203(1). After the geographical shift away from Lochbuie, the district no longer fell under the narrow exception in section 32-1-203(1) for a special district contained entirely within the boundaries of a municipality. *Id.* The district's borders extended outside of Lochbuie and into Weld County, triggering additional notice and approval requirements. *See* §§ 32-1-203, -207. We therefore agree with the district court that the district's 2011 geographical shift and its

altered purposes, as reflected in the delayed 2013 plan, lacked approval from an appropriate governing authority under section 32-1-203(1).

¶ 25    For example, the reference in section 32-1-401(1), C.R.S. 2016, that a county or municipality may file written objection to the inclusion of territory within a district and similar language in section 32-1-501(2), C.R.S. 2016 (regarding objections to the exclusion of territory from a district) — coupled with the requirement of approval from the board of county commissioners contained in section 32-1-207(2)(a) — support the proposition that the legislature intended the county to have notice.  After all, how can the county object to or approve a district's action if it is not provided notice of the district's proposed action?  *See, e.g., Climax Molybdenum Co.*, 812 P.2d at 1173-74 (we must give statutes a reasonable construction); *Upper Bear Creek*, 715 P.2d at 800 (invalidating modification that lacked appropriate approval).

¶ 26    The record does not document that the Weld County Board of County Commissioners ever approved the district's 2011 material

alterations (in purpose or location).[3] Accordingly, the purported changes violated the Act and the 2004 plan.

¶ 27 Sand Hills argues that the inclusion or exclusion of property within a district cannot impair or affect its organization and that once formed the district's status as a legal entity cannot be challenged. This sort of unbounded power is not contemplated by the Act. The Act is clear that material modifications of a district's service plan can be challenged. *See* § 32-1-207(2)(a); *see also* § 32-1-209 (requiring districts to report to the board of county commissioners and allowing the county treasurer to withhold moneys). To hold otherwise would lead to an absurd result, which we must avoid. *Crandall*, 238 P.3d at 662.

¶ 28 Sand Hills further argues that, even if deemed a material modification of the 2004 plan, the 2011 exclusion of Lochbuie from the district's boundary cannot affect the district's legal status or authority to conduct business. However this argument conflicts with the clear language of the Act, which requires the appropriate

---

[3] The briefing reflects that Sand Hills relied only on the Lochbuie Town Council's approval. But, as soon as the district exceeded Lochbuie's boundaries, the Town Council ceased to have authority to approve purpose or location changes to the plan.

governing authority to approve material modifications to a service plan. *See* § 32-1-207(2)(a); § 32-1-209 (reporting requirements and sanctions authorized).

¶ 29    Sand Hills also argues that the exclusive remedy under the Act would be to enjoin the faulty material modification, and that based on Sand Hills' notice dated April 1, 2009, the time period for challenges to its 2011 and 2009 actions expired before Taxpayers filed their original lawsuit. *See* § 32-1-207(3)(b) (providing that an action to enjoin the levy of taxes by a special district must be brought within forty-five days of the special district filing notice of its intent to undertake the challenged action). But, Sand Hills' only notice, which was published in the Brighton Standard Blade newspaper (located in Adams County), did not meet the statutory notice requirements needed to include the 70 Ranch property (located in Weld County) in the district. Section 32-1-207(3)(b) unambiguously requires that such notice "shall describe the activity proposed to be undertaken by the special district" and include the timeframe for actions to enjoin such activity.

¶ 30    Sand Hills' 2009 publication did not advise that a material departure from the 2004 plan was proposed or that the operative

objection timeline would begin to run.  And, Sand Hills has not cited any portion of the record evidencing that it properly provided the Weld County Board of County Commissioners with notice of the 2011 or 2009 material departures.  Sand Hills' timeframe argument fails.  Sand Hills' 2009 notice did not meet the statutory requirements for notice under section 32-1-207(3)(b).

¶ 31     For all of the foregoing reasons, we affirm the trial court's grant of Taxpayers' motions for summary judgment as to the time period after April 28, 2011.

## 2.     The District's 2009 Actions

¶ 32     We now focus on the district's geographic shift in 2009 to include the 70 Ranch property.  For reasons similar to those articulated above, we conclude that this shift was also a material modification of the district's 2004 plan that required, but did not receive, the approval of the Weld County Board of County Commissioners.

¶ 33     Section 32-1-207(2)(a) provides examples of changes of a basic or essential nature.  The Act contemplates adding new types of services, decreasing the level of services, as well as decreases in the existing or projected need for services in the organized area as

16

potential material modifications to a service plan. *Id.* The district's inclusion of the 70 Ranch property in 2009 changed the district's basic or essential nature, because new, substantial acreage (13,000 acres) outside of Lochbuie was proposed for district services.

¶ 34    Sand Hills argues that district boundary changes are not material modifications. However, when the boundary change, as here, involved local town-level approval of the inclusion of property over which a county-level governing body has authority, the Act protects the county from a special district including land within its boundaries and imposing tax liability on property without the county's knowledge or approval. *See* § 32-1-207(2)(a). Because special district action could unfairly burden county land previously located outside of the special district, the Act requires notice to and approval from the correct governing authority — here, Weld County. *Id.*

¶ 35    Adding the 70 Ranch property, with only the Lochbuie Town Council's approval and without notice to, or consent from, Weld County, materially altered the district's 2004 plan and fell short of the Act's requirements. The 2004 plan clearly articulated a localized effort to fund the Altamira Development. Moreover, the

17

district's failure to even begin to provide any of the benefits proposed by the 2004 plan, while imposing a mill levy on Taxpayers beginning in 2009, exemplifies the sort of district action (or inaction) that warrants oversight.[4]  Absent Weld County's approval, Sand Hills' actions violated the Act.

¶ 36     Similarly, by adding the 70 Ranch property, located outside of Lochbuie, the district could no longer rely on the narrow exception in section 32-1-203(1) (for districts entirely within a municipality) and had to get the Weld County Board of County Commissioners' approval for material modifications to the service plan.  *See* §§ 32-1-203(1), -207(2)(a).  Because the 2009 geographic shift constituted a material modification of the service plan, the attempted execution of the geographic inclusion, without approval from the Weld County Board of County Commissioners, violated the Act.  *See* §§ 32-1-203(1), -207(2)(a).

---

[4] The county would certainly have an interest in any mill levy imposed and could be concerned with the district's compliance with other state law, such as the Taxpayer's Bill of Rights Amendment to the Colorado Constitution, *see* Colo. Const. art. X, § 20(1). Precisely because of these interests, the Act requires reporting to the county and includes potential sanctions for failure to do so.  *See* § 32-1-209, C.R.S. 2016.

¶ 37 In sum, the district's geographical shifts, in 2009 and in 2011, the district's failure to implement the services articulated in the 2004 plan, and the district's unilateral actions that effectively expanded the 2004 plan without the appropriate government's approval constituted de facto material modifications to the 2004 plan and violated the Act.[5] Because of this, the district did not have taxing authority either between 2009 and 2011 or after 2011. We therefore affirm the trial court's judgment as it relates to Taxpayers' motion for summary judgment for the time period after the 2011 geographical shift, but we reverse the trial court's judgment as it relates to Sand Hills' motion for summary judgment for the time period from 2009 until 2011.

### 3. Notice to the Subsurface Mineral Lessees

¶ 38 The parties and the trial court focus much argument and analysis on whether owners of a subsurface mineral lease are properly considered fee owners such that their approval is required

---

[5] Sand Hills' alleged compliance with sections 32-1-401 and -402(1)(d), C.R.S. 2016 (providing how a special district may alter its boundary by the inclusion of more property and stating that a change of boundary shall not affect the special district's organization), does not justify its noncompliance with section 32-1-207(2)(a), C.R.S. 2016.

for the inclusion of property within a special district pursuant to section 32-1-401(1)(a). However, because we reach our conclusion based solely on the fact that the district's actions in 2009 and 2011 constituted material modifications of the service plan under section 32-1-207(2)(a), we need not determine the breadth of the term "fee owner."[6] See Laleh v. Johnson, 2016 COA 4, ¶ 9 (a court need not determine all issues when our resolution of another issues concludes the matter) (cert. granted Sept. 6, 2016); Robertson v. Westminster Mall Co., 43 P.3d 622, 628 (Colo. App. 2001) (court does not render advisory opinions).

## III.    Appropriate Remedy

¶ 39    Sand Hills contends that the trial court erred by requiring it to preserve funds paid by Taxpayers. We disagree.

¶ 40    At a status conference in April 2015, the trial court heard argument about whether Taxpayers should have to pay taxes in 2014 and whether Sand Hills should be forced to hold the funds

---

[6] We need not address the parties' arguments regarding a court's ability to dissolve a special district (which the trial court's order did not do), separation of powers, or the Colorado Constitution. *See Tyler v. Sch. Dist. No. 1*, 177 Colo. 188, 189, 493 P.2d 22, 23 (1972) ("When it is not necessary for the decision to test the constitutional questions raised, we do not so do.").

they received pending the outcome of the case on appeal. At that hearing, counsel for Sand Hills stated, with regard to taxes paid for 2014 and going forward,

> [W]e understand the plaintiff's concern and we are fully willing to hold these funds in a segregated account, and agree not to spend it, and agree to your entry of an order that directs us not to spend those funds . . . that is the solution that we think is the best one . . . we don't object to Sand Hills holding those funds in a segregated account, pursuant to the order of the Court.

We therefore conclude that, as to taxes paid for 2014 and after, Sand Hills acquiesced to the trial court's action and failed to properly preserve their argument. *See Berra v. Springer & Steinberg, P.C.*, 251 P.3d 567, 570 (Colo. App. 2010).

¶ 41 As to the preservation of funds relating to taxes paid for 2011 through 2013, Sand Hills preserved their objection in their written motion.

¶ 42 After the court granted summary judgment in favor of Taxpayers for the time period after April 28, 2011, the parties filed written briefs on Taxpayers' motion to preserve funds and assets from tax years 2011 through 2013. The trial court ordered that, "[t]o the extent the funds collected from the [Taxpayers] exist, the

21

Court orders that the funds be preserved." Sand Hills argues that this order amounted to a prejudgment writ of attachment. We agree with Taxpayers that this order amounts to a stay of judgment pending appeal; thus, we review for an abuse of discretion. *See Romero v. City of Fountain*, 307 P.3d 120, 122 (Colo. App. 2011).

¶ 43 Having affirmed the trial court's judgment as it related to the 2011 through 2013 tax years, we also conclude that the trial court's order preserving funds received for tax years 2011 through 2013 (to the extent such funds existed) was not manifestly arbitrary, unreasonable, unfair, or contrary to law. *Dickinson v. Lincoln Bldg. Corp.*, 2015 COA 170M, ¶ 7. Thus, the trial court did not abuse its discretion. *Id.*

## IV. Noble and Other Taxpayers

¶ 44 Noble was joined as an involuntary plaintiff in Taxpayers' amended complaint below. Noble filed pleadings in the trial court and a brief on appeal. It argues that it is similarly situated to Taxpayers and that any relief granted to Taxpayers on appeal should also extend to taxes paid by Noble. We agree.

¶ 45 From the beginning of this litigation, Noble has held itself out as being similarly situated to Taxpayers — Noble paid taxes

22

following Sand Hills' inclusion of the 70 Ranch property within the district's borders. However, the trial court's summary judgment order focused only on Taxpayers and did not mention Noble, other than including it as an involuntary plaintiff on the order's caption page. We conclude that because Noble was involved throughout the litigation below as a party similarly situated to Taxpayers, the relief granted to Taxpayers applies to Noble. On remand, the trial court shall consider Noble similar to Taxpayers and shall make rulings accordingly.

¶ 46    However, nothing in the record indicates that other taxpayers agreed to be represented in this litigation. *See Prinster v. Dist. Court,* 137 Colo. 393, 397, 325 P.2d 938, 940 (1958) (generally, a court avoids adjudicating the rights of parties not before it).

¶ 47    Accordingly, our conclusions here and the trial court's rulings apply to Bill Barrett Corporation, Bonanza Creek Energy, Inc., and Noble Energy, Inc. as parties to this case.

## V.    Conclusion

¶ 48    The judgment is affirmed in part and reversed in part. The case is remanded to the trial court to order the release of the preserved funds for the 2011-2013 period and to enter a judgment

23

for funds collected from April 29, 2009, until April 28, 2011, consistent with this opinion.

JUDGE BERNARD and JUDGE RICHMAN concur.